UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2013 APR 16  PM 5 18

YUE YU,

                PLAINTIFF,

     vs.

HOLLY MCGRATH
BRISTOL-MYERS SQUIBB

             DEFENDANTS.

)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action**

**DOCKET NO. 3:11-cv-05446-PGS-DEA**

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1, Plaintiff Yue Yu (Plaintiff or "Ms. Yu"), hereby submits Statement of Undisputed Material Facts in support of Plaintiff's Opposition to Defendants' (BMS and McGrath) Motion for Summary Judgment.

### PLAINTIFF INDEED WAS AN EMPLOYEE OF BMS

#### BMS HIRED OUTSIDE VENDOR AND RECRUITING FIRMS TO RECRUIT PLAINTIFF

1. In July 2009, Plaintiff received an email advertisement of a consultant opportunity with a major pharmaceutical company in Princeton New Jersey. Plaintiff was interested in the position; therefore, she contacted the advertiser: Scientific Search.

2. Plaintiff spoke to Jim Jenkins (Jenkins), who was Vice President, practice lead at Scientific Search. Mr. Jenkins told Plaintiff that the hiring company was Bristol-Myers Squibb (BMS) and the position was located at its Lawrenceville campus in New Jersey. The position with BMS was open due to a current consultant wanted to return to her home in San Francesco. Plaintiff

agreed to apply for the position. Plaintiff considers Scientific Search is a head hunter and recruiter for hire. Normally, a recruiter receives a certain percentage of a successfully placed candidate salary.

3.  In July 2009, Jenkins told Plaintiff that she had to go through a screening process before her resume could be submitted to BMS. Plaintiff agreed to the screening. Mr. Jenkins told Plaintiff that Robert Delghiaccio ("Delghiaccio) of GfK Healthcare (GfK) would be the screener. Mr. Jenkins told Plaintiff that GfK was another recruiter. Delghiaccio held telephone screening with Plaintiff on July 27, 2009. After the screening, Delghiaccio informed Plaintiff that he planned to present her CV to the team at BMS. See Ex. A at 1.

4.  On July 28, 2009, Delghiaccio sent an email to inform Plaintiff that "I heard back from BMS, and they liked your CV and definitely want to meet with you. The main stakeholder (Holly McGrath) will be out next week, so we are looking at meetings on Wed, August 12." See Ex. A at 2. Delghiaccio also wrote: "only slight glitch is that Holly would also like for you to meet with some other BMS stakeholders as well, and they work out of the BMS Plainsboro, NJ office …" id.

5.  On July 30, 2009, Delghiaccio sent Plaintiff Interview Schedule with McGrath via email. Delghiaccio offered Plaintiff debrief prior to those interviews to help Plaintiff prepare just as all recruiters do with any job candidates. See Ex. A at 3 and 4.

6.  BMS scheduled Plaintiff's interview with Holly McGrath, Daniel Stults and Joey Li. See Ex. A at 4. The Interview Schedule was printed on BMS's interview schedule standard template with BMS's name and logo. Holly McGrath was identified as Hiring Manager, and Plaintiff was identified as candidate. Position Title is Manager, Global Oncology MR. Id.

7.  Delghiaccio offered to meet with Plaintiff and help Plaintiff prepare her upcoming interviews with BMS in early August 2009. However, Delghiaccio didn't meet with Plaintiff in person, he spoke to Plaintiff over the telephone instead. Delghiaccio provided backgrounds of each

interviewer and their working styles. Just like most recruiters with their candidates, Delghiaccio prep Plaintiff for her upcoming interviews at BMS.

8. On or about August 20, 2009, Delghiaccio notified Plaintiff that she was hired by BMS and the starting date was Sept. 21, 2009. In the meanwhile, Delghiaccio asked Plaintiff to provide some personal information in order to set up Plaintiff in BMS's system.

9. Delghiaccio also told Plaintiff that the initial term of service was six months from September 21, 2009 to March 31, 2010 with potential extension throughout 2010.

10. Delghiaccio told Plaintiff since Scientific Search found Plaintiff; it was entitled to receive finder's fee. Therefore, Plaintiff had to receive her payment through Scientific Search in order for Scientific Search to receive its fee.

11. Delghiaccio also told Plaintiff that Plaintiff had to sign a contract with GfK in order to receive her payment.

12. Delghiaccio and Jenkins told Plaintiff the contracts were for payment process purpose. In Plaintiff's opinion, the contracts with Plaintiff were to ensure their finders' fee.

13. Scientific Search offered Plaintiff $70 per hour as a W2 receiver without any benefit. Scientific Search told Plaintiff that she could buy medical and dental insurance through Scientific Search without any contribution from BMS.

14. Plaintiff told Scientific Search the $70 per hour compensation was below standard for her experience and skill set. In addition, there were costs associated with the long commute from Plaintiff's home to BMS. Scientific Search told Plaintiff it could raise the rate to $90 if payment is for business to business. It suggested use Plaintiff's inactive consulting firm to receive payment for Plaintiff's work. Plaintiff accepted the suggestion, and purchased necessary business insurance policies per Scientific Search's request. Plaintiff signed contract between G&G and Scientific Search us See Ex. B at 7 -10.

15. The responsibilities for Plaintiff's position at BMS are: interface with brand team to identify key research questions, study design, development of RFP, vendor selection, development of survey instrument, overseeing research execution, and development of final presentation to the brand team for each of the anticipated projects: A. EVEI Preliminary Positioning Development, B. EVRI Message Development Qualitative, C. Non-Small Cell Lung Cancer Qualitative, D. Non-Small Cell Lung Cancer Qualitative, E. Ixempra Communication Platform Qualitative, F. Avastin In GBM Tracking, G. Ad Hoc Syndicated Data Analysis, H. Budget Management for Large Tumor Franchise Marketing Research. See Ex. B at BMS00005.

16. BMS signed a contract with GfK (SOW). See. Ex. B at BMS0005-00007.

17. Scientific Search signed a contract with GfK. See Ex. B at 4-6.  BMS paid $190 per hour to GfK for Plaintiff's work at BMS, whereas, GfK paid $139 per hour to Scientific Search, whereas, Scientific Search paid $90 per hour to Plaintiff. See Ex. B at BMS0005-0007, at 4-6, and at 7-10.

18. BMS paid $190 hourly rate for Plaintiff's consulting service up to 40 hours a week. BMS only agreed to pay $205 per hour for overtime. See Ex. B at BMS0005-0007. It is violation of Fair Labor Standard Act (FLSA). FLSA requires the overtime payment "at a rate not less than one and one-half times the regular rate of pay." Plaintiff's compensation for overtime payment should have been $280 per hour.

19. Plaintiff didn't receive compensation at the FLSA required at one and half of the regular rate.

20. For every hour Plaintiff worked at BMS, GfK made $51 per hour, Scientific Search made $49 per hour; Plaintiff only received $90 per hour. In another word, for every hour Plaintiff worked, the recruiters (Gfk and Scientific Search) earned $100 without any actual work; whereas, Plaintiff who actually did all the work, only received $90 per hour. See Ex. B at BMS0005-0007 and at 4-10.

21. Plaintiff didn't meet with Delghiaccio before BMS hired her. Plaintiff didn't meet with any other employees of GfK for interview purpose. Plaintiff didn't meet with any other employees of GfK for any purpose.

22. At all relevant times, Plaintiff considers Gfk a recruiter for BMS.

23. At all relevant times, Plaintiff considers Scientific Search a recruiter.

24. Plaintiff signed contracts with GfK and Scientific Search with understanding that the contracts were for payment process purpose only.

25. BMS, on the other hand, is the true employer of Plaintiff. BMS hired Plaintiff as a consultant to avoid paying all employment related taxes and employee benefits to Plaintiff.

26. McGrath was in 100% control of Plaintiff's hiring, day-to-day work and Plaintiff's termination.

27. McGrath drafted the requirements and responsibilities for the position which Plaintiff was interviewed and hired. See Ex. C (BMS02087-02089, BMS02091-02093, email chain between McGrath and Delghiaccio)

28. GfK worked with several recruiting firms to find candidates to fill the position for BMS and the hiring decision was made by BMS. See id., Ex. D (Delghiaccio Dep. 14:12-16:21).

29. Jenkins of Scientific Search told Plaintiff that McGrath interviewed six candidates for the consultant position.

30. Meky Ayele and Plaintiff were among the several candidates provided by GfK for interviews at BMS.

## PLAINTIFF'S BUSINESS RELATION WITH GfK, SCIENTIFIC SEARCH AND HOW PAYMENT WAS PROCESSED FOR EVERYONE

31. Scientific Search and GfK are recruiters who matched Plaintiff to the BMS's position. The business relationship between Plaintiff and Scientific Search is candidate and recruiter. The business relationship between Plaintiff and GfK is candidate and recruiter.

32. Recruiters receive finder's fee after placing candidates successfully. So do Scientific Search and GfK. Scientific Search and GfK received their finders' fee through processing Plaintiff's payment from BMS.

33. The payment arrangement enabled BMS to escape all taxes related to employment and avoid paying employee benefit to Plaintiff.

34. Plaintiff received her payment through Great & Guangda (G&GD). Plaintiff founded G&GD in January, 1997 to distribute computer parts. G&GD ceased computer part distribution business in 1999. G&GD also engaged in consulting services. However, G&GD had been inactive and Plaintiff hadn't engaged in any consulting business for several years prior to join BMS.

35. Delghiaccio instructed Plaintiff to file overtime hours at regular rate and not to file traveling time spent for conducting market research service on behalf of BMS.

36. At the time relevant, Plaintiff was NOT compensated for hours she traveled for BMS's business, neither was compensated for the night she stayed outside her home state while on business trip. In addition, Plaintiff was not compensated for the correct amount for the overtime.

37. At the time relevant, Plaintiff traveled from New Jersey to Washington, D.C, to Chicago, Phoenix, San Diego, Ft. Lauderdale, to conduct market research projects on behalf of BMS. Plaintiff was owed hundreds of hours of unpaid travel time and nights away time which translate several tens of thousands of dollars.

38. The payment flow is: 1) At the end of each month, Plaintiff submitted a timesheet to McGrath for her approval. 2) After the approval of Plaintiff's timesheet, GfK billed BMS for the number of hours Plaintiff worked for BMS for the particular month at $190 per hour, 3) Scientific Search billed Gfk for the same amount of hours Plaintiff worked at $139 per hour, 4) Plaintiff billed Scientific Search for the number of hours she worked for BMS at

$90 per hour. See Ex. F (BMS00720-00721, BMS00783-00784, BMS00811-00812, BMS00911-00912, BMS00947-00948, BMS02421-02423, 14-15).

## PLAINTIFF ONBOARD

39. On or about September 18, 2009, Plaintiff received a phone call from Delghiaccio informing her McGrath would not be available on September 21, the original starting date for Plaintiff. McGrath wanted Plaintiff to start work on September 22, 2009. Delghiaccio suggested that Plaintiff come to his office to meet with him and Jenkins for lunch on September 21, 2009. Plaintiff agreed and met with Delghiaccio and Jenkins.

40. Plaintiff was requested to provide personal information to BMS before her starting date. On or about September 16, 2009, Plaintiff was established in the BMS's system. A BMS email account for Plaintiff was established as yue.yu@bms.com; a working station, a desktop computer, a telephone line were provided for Plaintiff. In October 2009, Plaintiff was given a laptop to replace the desktop computer.

41. For the two weeks following starting date, Plaintiff finished mandatory trainings identified by BMS. Plaintiff was granted access to various BMS database/computer systems used for project initiation, review, commission, budget management and final products sharing.

42. On September 22, 2009, upon Plaintiff's arrival at BMS, a security badge was issued to Plaintiff. The security badge granted access to all office buildings at Lawrenceville, and Plainsboro New Jersey.

## MCGRATH CONTROLED PLAINTIFF'S DAY-TO-DAY WORK

43. See Ex. B at BMS00005. BMS required Plaintiff to report to Holly McGrath, Market Research Director. BMS also required Plaintiff to assume the role and responsibility of an

internal "BMS" employee. McGrath became Plaintiff's direct manager after Plaintiff started to work for defendants.

44. Plaintiff met with McGrath on September 22, 2009, Plaintiff's first day at BMS. McGrath provided Plaintiff with overview of BMS Oncology Business structure with emphasis of marketing team members and outlined projects assignments. See Ex. G at 1 (Note by Holly) and at 2 (Yue's notes)

45. On September 23, 2009, Plaintiff's second working day at BMS, McGrath met with Plaintiff to provide detailed instructions for several market research projects. McGrath also requested Plaintiff to meet with several oncology market key personnel including Dan Guo, Linda Kozick, Adrienne Ross. McGrath also told Plaintiff to use the MR Plan template for MR Planning. In addition, McGrath cited names of finished market research projects and instructed Plaintiff to use those reports as reference and learning tool. See Ex. G at 3-5.

46. Plaintiff resumed role and responsibilities of an internal BMS employee from Day 1 of joining BMS. Plaintiff worked under McGrath's guidance and supervision from the first day of Plaintiff's working at BMS.

47. McGrath told Plaintiff that she met with her all direct reports weekly to go over project progress and business updates. Therefore, no exception for Plaintiff. After the meeting with McGrath, Dolores Slayton, the assistant to McGrath established a weekly meeting schedule for Plaintiff with McGrath.

48. The weekly meeting between Plaintiff and McGrath for 2009 was scheduled on very Monday from 3:00PM to 3:30PM. See Ex. E at BMS 00728.

        Subject: 1:1 w/Yue Yu

        Location: Holly's Office

        . . . . . . . . . . . . .

8

When: Occurs every Monday effective 10/5/2009 until 12/28/2009 from 3:00PM to 3:30PM (GMT-05:00) Eastern Time (US& Canada).

49. The weekly meeting between Plaintiff and McGrath for 2010 was scheduled on every Tuesday from 9:30AM to 10:30AM. See Ex. E at BMS 00898.

Subject: 1:1 w/Yue Yu

Location: Holly's Office

…………

When: Occurs every Tuesday effective 1/5/2010 until 12/20/2010 from 9:30AM to 10:30AM (GMT-05:00) Eastern Time (US& Canada)

50. Plaintiff discussed the project approaches, some issues or obstacles, and progress during her regular weekly one-on-one meeting with McGrath. Plaintiff obtained guidance, instruction and approval. See Ex. G at 6-12 (Plaintiff's notes of meetings with McGrath)

51. Plaintiff obtained approvals from McGrath for all market research plans, selection of market research vendors and final reports for primary market research project EVRI and XL184. See Ex. G at 6-12 (Plaintiff's notes of meetings with McGrath). McGrath also provided BMS Marketing Excellence Link and ME Positioning Guide to guide Plaintiff's approach of EVEI Preliminary Positioning Project. (EVRI Project). See Ex. G at BMS00724-00725.

52. Plaintiff was requested to provide a copy of all her work furnished for BMS marketing teams.

53. In addition to submit timesheet to McGrath, Plaintiff was required to report her absence from the office. See Ex. I (BMS02602). Plaintiff informed McGrath that she couldn't go to the office to work due to a family situation. Plaintiff will work from home instead.

54. In March 2010, McGrath questioned Plaintiff's timesheet for February 2010. See Ex. F, at BMS02422-02423. This was the first time McGrath had questions for Plaintiff's Timesheet.

**PLAINTIFF' "INTERNAL" ROLE AND RESPONSIBILITIES OF BMS EMPLOYEE**

**AND ESTABLISHED AS THE GO TO PERSON**

55. Plaintiff's work at BMS is no different from her team members' such as Latric Abynie, Jessica Lu, or Rishabh Mehreja.

56. Brand team members considered Plaintiff a BMS employee. See Ex. T at BMS01154. Jill Orosz, Oncology invited Plaintiff to participate the strat planning BMS-internal team. Id.

57. Plaintiff was considered a team member of BMS Global Oncology Market Research Team. She was invited to MR social event on Feb. 18, 2010. See. Ex. T at BMS00969, the email Plaintiff wrote to Dan Stults, Senior Director, Global Oncology. Plaintiff was invited to Global Oncology Market Research monthly team meetings. Plaintiff was invited to Oncology marketing team meetings.

58. Latrice Abanyie, Associate Director, Oncology considered Plaintiff her colleague. See Ex. T at BMS02283.

59. Latrice Abanyie thinks Plaintiff the "go to" for large Tumor MR Budgets. See Ex. T at BMS002376.

60. Adrienne Ross, Vice President of XL184 marketing considered Plaintiff a member of XL184 core team. Ms. Ross invited Plaintiff to participate XL184 2010 meeting. Ms. Ross identified XL184 key players to be invited to future strategic meetings: Jill Orosz (Marketing), Cecille Carbonelle (Access), Kald Abdallah (Medical Affairs) and Yue Yu (Market Research). See Ex. T at BMS02275.

61. Susan Heinberg, Jamie Foley and Dan Guo had relied on Plaintiff to provide secondary data analysis to support their business decision. See Ex. T at BMS02386 and BMS2388.

62. Plaintiff worked with many market research vendors such Tankar Health (TNS), Decision Resources, IMS Healthcare, Synovate and ADP Delphi and Gfk. Of course, GfK also served as recruiter and payment processor for Plaintiff.

63. Mr. Delghiaccio was the key contact person for both recruiter and market research vendor functions.

64. Ms. McGrath and Plaintiff scheduled weekly one-on-one meetings starting September 2009 right after Plaintiff's assignment at BMS started. The weekly one-on-one meeting is similar to other team members' weekly one-on-one meetings. All McGrath' team members including Plaintiff had weekly one-on-one meetings. Those meetings normally took place as scheduled except holidays and business travel.

65. Plaintiff had regularly weekly one-on-one meetings from September 2009 till March 8, 2010. McGrath cancelled scheduled weekly meeting after Plaintiff challenged her discriminatory motive of not considering Plaintiff's application for the full time position.

66. Plaintiff usually worked from 8:30AM to 5:30PM at BMS every day at the time relevant to the matter.

67. Plaintiff's working station is outside Latrice Abanyie, a team member of McGrath and on the way to lady's room and cafeteria. McGrath passed Plaintiff's working station several times during a typical work day.

68. Other BMS employees including but not limit to Latrice Abanyie, Mark Ramey, Jessica Lu, Blair Ferguson, Jigsha Shelet had witnessed Plaintiff's working schedules. In particular, Latrice Abanyie, Mark Ramey and Blair Ferguson had particular knowledge of Plaintiff working everyday onsite during the time relevant in that their offices are next to Plaintiff's working station.


**PLAINTIFF WAS AN EMPLOYEE OF BMS ACCORING TO ITS POLICY**

## BMS POLICY DETERMINES PLAINTIFF WAS AN EMPLOYEE

69. Plaintiff worked full time at BMS Lawrenceville, New Jersey from September 22, 2009 to March 23, 2010. During the same period, except travel time for business and nights spent outside home state, Plaintiff worked 968 hours at BMS. See Ex. F at BMS02421, at 15. BMS had paid about $183,920 for the service Plaintiff provided. ( 968 hours  * $190)

- Plaintiff worked 32 hours for BMS in September 2009. See Ex. F at BMS00721.

- Plaintiff worked 192 hours for BMS in October 2009. See Ex. F at BMS00784.

- Plaintiff worked 149.5 hours for BMS in November 2009. See Ex. F at BMS00812.

- Plaintiff worked 140 hours for BMS in December 2009. See Ex. F at BMS00912.

- In the December 2009, Plaintiff traveled to Washington, D.C., Chicago and San Diego for BMS's business. The 140 hours didn't include Plaintiff's travel time nor include her night spent outside her home for BMS business.

- Plaintiff worked 199 hours for BMS in January 2010. See Ex. F at BMS00948.

- In the January 2010, Plaintiff traveled to Ft. Lauderdale, FL., Phoenix, AZ and San Diego for BMS's business. The 199 hours didn't include Plaintiff's travel time nor include her night spent outside her home for BMS business.

- Plaintiff worked 134 hours for BMS in February 2010. See Ex. F at BMS02421.

70. At the time relevant to this matter, Plaintiff's income from assignment at BMS represents 100% of her income.

71. Plaintiff didn't make significant investment in her business.

72. At the time relevant, BMS has a Policy to govern how to engage an independent contractor. The policy is titled as:  Bristol-Myers Squibb Company Financial Shared Services Directive Engagement of Independent Contractors. (BMS Directive) See Ex. J (BMS00205— BMS00217)

73. The BMS Directive requires candidates must be validated as an independent contractor before engaging any types of work. The initial review and validation of a Candidate will be made by an external vendor selected by the Company based on criteria set forth by the Internal Revenue Service (IRS), Department of Labor, Federal and state governmental entities and case law decided by the courts. Examples of such criteria include, but not limited to, the existence of other clients, lump-sum payments regardless of hours worked, the percentage of candidate's total annual business represented by the BMS project, and whether the Candidate has made a significant investment in the Candidate's business. This determination will take into account information supplied by the Candidate and the BU manager. See Ex. J at BMS00206, at BMS00214. The BMS Directive requires BU shall not utilize an Independent Contractor candidate's services unless and until such individual has been reviewed and validated as an Independent Contractor in accordance with the procedure described within the BMS Directive. No service may be commenced by the Independent Contractor candidate until all requisite paperwork is received and all approved are obtained. See Ex. J at BMS00214.

74. Plaintiff was never validated as independent contractor by BMS.

75. The Qualified Alternative Validation Criteria listed on The BMS Directive can't validate Plaintiff as an independent contractor. See Ex. J at BMS00208.

    The Qualified Alternative Validation Criteria states:

A candidate providing Qualified Services who cannot or will not make all of the IC representations will be validated as an Independent Contractor under Qualified Alternative Validation but only if the following are true:

- The candidate is not be paid more than $30,000 USD per 12 month period; and

- As an Independent Contractor, the candidate would not work more than 10 calendar days per (or 80 total hours) per 12 month period, unless the Candidate is a BMS retire, in which case, the candidate will be limited to working no more than 10 hours per 12 months period.

76. Plaintiff couldn't be validated as an independent contractor in that there are too many violations of the BMS Direct. The violation include: 1) BMS payment exceeded $30,000 in 12 month period (actual payment was$183,920), 2) Plaintiff worked more than 80 hours per 12 month period (actual hours were 968 hours in about six months), 3) Plaintiff's income from BMS represents 100% of her income, (49% was the maximum for Independent Contractor) and 4) Plaintiff had no investment in her work at BMS.

### Plaintiff Was NOT Independent Contractor BY IRS's Rules

77. Plaintiff was an employee of BMS according to the IRS's 20 Questions for Independent Contractors. See Ex. U. (IRS's 20 Questions for Independent Contractors). Plaintiff's answers to the IRS's 20 Questions are the following in the parenthesis ( ). According to IRS, the more answers of "Yes", the more likely employee. Plaintiff answered all questions with "Yes".

1) Are you required to comply with instructions about when, where, and how the work is to be done? (Yes. Plaintiff was required to follow instructions provided by BMS employees including McGrath to perform work. )

2) Does your client provide you with training to enable you to perform a job in a particular method or manner? (Yes. BMS provided trainings for Plaintiff in order to her to use three particular BMS project management databases/systems. )

3) Are the services you provide integrated into your client's business operation? (Yes.

Plaintiff was the key market research team lead for BMS's global oncology business. Plaintiff's work products were integrated into BMS's business strategic plan and operation.) Ex. P at BMS02531.

4) Must the services be rendered by you personally? (Yes. Plaintiff worked at BMS's Lawrencevill campus full time.)

5) Do you have the capability to hire, supervise, or pay assistants to help you in performing the services under contract? (No.)

6) Is the relationship between you and the person or company you perform services for a continuing relationship? (Yes.)

7) Who sets the hours of work? (BMS did.)

8) Are you required to devote your full time to the person or company you perform services for? (Yes.)

9) Is the work performed at the place of business of the potential employer? (Yes.)

10) Who directs the order or sequence in which the work must be done? (BMS/McGrath did. Plaintiff received many requests from BMS brand team and marketing personnel then perform tasks based upon requests from BMS. Ex. P at BMS02178. )

11) Are you required to provide regular written or oral reports to your client? (Yes. Plaintiff routinely provided written analysis reports fro BMS's business operation.)

12) What is the method of payment — hourly, commission or by the job? (Hourly.)

13) Are your business and/or traveling expenses reimbursed? (Yes.)

14) Who furnishes tools and materials used in providing services? (BMS did.)

15) Do you have a significant investment in facilities used to perform services? (No.)

16) Can you realize both a profit and a loss? (No.)

17) Can you work for a number of firms at the same time? (No. Plaintiff worked full time at

BMS. Sometimes, Plaintiff worked more than 40 hours a week for BMS. There was no way Plaintiff could work for other firms.)

18) Do you make your services available to the general public? (No.)

19) Are you subject to dismissal for reasons other than nonperformance of contract specifications? (Yes.)

20) Can you terminate your relationship without incurring a liability for failure to complete a job? (Yes.)

According to IRS, the more answers of "Yes", the more likely employee. Plaintiff answered most of the above 20 questions with "Yes". Therefore, Plaintiff was an employee of BMS.

## Primary Market Research Project Approach and Marketing

78. The purpose of primary market research is to gather information to address a particular business question, typically from marketing team. The gathered information aids business decision making. This therefore reduces risks involving with making those business decisions.

79. In pharmaceutical industry, marketing teams come to market research team for answers to their business issues or questions. Some of those questions and issues are addressed through conducting primary market research.

80. The steps are taken to conduct primary market research projects are:

- Market Research (MR) team confirms business questions with marketing team after marketing team approached MR team with a business question.

- MR team has in depth discussion with marketing team to ensure the business questions are valid and appropriate arisen from business issues.

- After the business question is confirmed, MR team proposes a market research project with clearly listed a set of objectives.

- Marketing team and MR team discuss the objectives and to ensure the objectives are in line with the business questions.

- After marketing team signs off the Market Research Plan, market research lead send out RFP to solicit proposals.

- Market researcher will commission the market research project to the vendor whose proposal has the best approach and reasonable pricing.

- Then, market researcher will work with the vendor to execute the market research project such as developing questionnaire and discussion guide, gathering research stimuli and fielding management. The vendor provides report, and market researcher transforms the report into presentation and present to marketing team.

81. Most large pharmaceutical companies have market research function separate from marketing function to ensure the independence of market research. BMS is no exception. It is not uncommon that market researchers disagree with marketing team members during the various stages of market research projects.

82. Market researchers have to ensure objectivity, sound and scientific approach for any given research project.

## PLAINTIFF HAD CONDUCTED PROJECTS FOR MANY BMS EMPLOYEES AND THEY ARE SATISFIED WITH THE SERVICES PROVIDED BY PLAINTIFF

83. Plaintiff had performed and conducted data analysis, created, produced and assembled tracking report to provide support to many business strategic decisions. Many BMS

colleagues were very happy with Plaintiff's work products. The following is a list of some projects Plaintiff accomplished at BMS:

- Sept. 2009, Endocrine Sensitive Breast Cancer Treatment US and EU for Susan Heinberg and Bill Hunt. See Ex. P at BMS01185.

- Oct. 2009, Alimta secondary data analysis for Jessica Lu and Marc Weiss, See Ex. P at BMS00746. (Plaintiff helped colleague Jessica Lu with Alimta secondary data analysis per McGrath's request).

- Nov. 2009, ER+BC date request for Denise Pettiecord and Rishabh Mehreja (Plaintiff MR Team member). See Ex. P at BMS01317, BMS01334-01335, BMS01375-01378.

- Nov. 2009, Alimta Usage Tracking in NSCLC for Marc Weiss, See Ex. P at BMS01319-01310, at BMS01359.

- Marc Weiss was very pleased with Plaintiff's work product. He forwarded the Alimta Usage Tracking to seven marketing members. He wrote: "*Thanks to Yue Yu for putting this together based on our parameters.*" See Ex. P at BMS02178.

- Nov. 2009, KITs fof NSCLC project for Dan Guo. See Ex. P, at BMS02480-02482.

- Nov. 2009, Ixa Budget update for Susan Heinberg and Jamie Foley. See Ex. P at BMS01644-01645.

- Nov. 2009, Early and Ixa Giveback for Jamie Foley. See Ex. P at BMS01405-01407.

- Nov./Dec. Plaintiff purchased three syndicated oncology market reports from Decision Source per marketing team and medical team's requests.

- January, 2010, Lung Cancer forecast data request for John Cavallaro. See Ex. P at BMS01888-01889.

- January, 2010, Avastin Usage Tracking in MBC for Susan Heinberg and Jamie Foley. See Ex. P at BMS02344, at BMS02348.

- January, 2010, Alimta Usage Tracking in NSCLC for Marc Weiss, See Ex. P at BMS02341.

- Feb. 2010, Alimta Usage Tracking in NSCLC for Marc Weiss, See Ex. P at BMS01901.

- Feb. 2010. 2010, Alimta Usage Tracking in NSCLC detailed data analysis for Dan Guo. See Ex. P at BMS00561-00562.

- Feb. 2010, Alimta Usage Tracking Special request for Susan Heinberg. See Ex. P at BMS02354, at BMS02359-02360.

- Ixa and XL184 MR Budget management

  - Tasks: There were funding left in Ixa market research budget due to the change of business direction. Plaintiff was able to utilize some of the funding to purchase data sets to address Ixa marketing team's business questions. Marketing team was very pleased with the result. See Ex. P at BMS01644 – 01645. Susan Heinberg stated: "Thanks Yue Yu for being so proactive. We are very pleased that we will be able to address our questions with these data sets and look forward to the discussion in December." Id.

84. **Other Project:** Mark Salvati's Ixa team was in need of data on the use of Pemertrexed doubles versus plclitaxel doubles as 1st line therapy for NSCLC in the US for Ixa program. Ex. P at BMS02341. **Result:** Marc Weiss provide Plaintiff's Alimta Usage Tracking in NSCLC to Mark Salvati. Marc Weiss also requested Plaintiff an update on the newest data. On February 8, 2010, Plaintiff provided Mark Salvati and Marc Weiss the latest Alimta usage in 1st and 2nd line NSCLC in US and UE. See Ex. BMS02359. Mark Salvati also

forwarded a copy of Plaintiff's Report to Susan Heinberg who later requested more detailed data analysis on the usage of Alimta.

**Projects:** Avastin Usage Tracking in MBC. Plaintiff started the tracking report for Avastin Usage per brand team Susan Heinberg's request. See Ex. P at BMS02344. **Result:** 1)Ms. Heinberg was satisfied. On Jan. 27, 2010, She wrote to Jamie Foley, "Jamie Here's the Avastin report as it stands right now. Yue Yu incorporated all the changes I requested and I am happy with it." Id. Susan even thought about asking Plaintiff to present to the upcoming 1st L MBC working team meeting or at the next Breast TSG meeting. Id. Ms. Heinberg also wanted Lind K, the Vice President of Oncology Marketing to see the report produced by Plaintiff. Id. 2) February 4, 2010, The Report was provided to a broader team of 11 senior BMS executives. See Ex. P at BMS02348.

**Projects:** Alimta Tracking Usage Tracking in MBC. Ms. Heinberg was intrigued by the Alima Tracking Report provided by Plaintiff. Ms. Heinberg requested more data analysis on the total share on Alimta-containing regimens as well as Docetaxel-containing regimens, in US and EU, in the 2nd Line setting. Ex. P at BMS02354. **Result:** Ms. Heinberg was satisfied. She also suggested Jamie Foley forward Alimta Tracking report to Linda K., the VP of Oncology. Id.  On Jan. 27, 2010, She wrote to Jamie Foley, "Jamie Here's the Avastin report as it stands right now. Yue Yu incorporated all the changes I requested and I am happy with it." Id. Susan even thought about asking Plaintiff to present to the upcoming 1st L MBC working team meeting or at the next Breast TSG meeting. Id. Ms. Heinberg also wanted Lind K, the Vice President of Oncology Marketing to see the report produced by Plaintiff. Id. See Ex. P at BMS02359 – 02360.

**Project:** Endocrine Sensitive Breast Cancer Treatment US and EU. Susan Heinberg and Bill Hunt of Oncology team requested ER positive breast cancer treatment summary in a

very tight deadline. Ex. P at BMS01185. **Result:** Plaintiff provided data analysis and furnished the Summary Report in the marketing desired format before deadline. Id.

### Plaintiff was Established As the Market Research Go To Person at BMS, and Had Received Many Apprises.

85. See Ex. P at BMS02376, Latrice Abanyie, Plaintiff's team member recommended to invite Plaintiff to join Large Tumor MR budget discussion when she was requested to bring the IXA market research budget to a meeting. Id. "in order to have any construction discussion on Large Tumor MR budget, I recommend inviting Holly or Yue Yu."

86. See Ex. P at BMS02386 and BMS02388. When Dan Guo asked Jaime Foley, Director for IXA, for some data of Avastin use in HER2-MBC patient, Jamie asked Susan Heinberg "Susan, Yue Yu can get this for us, right?" Id. Susan responded that she was working with Plaintiff to get more precise date on this ..." Id. Susan Heinberg also told Dan Guo that once clarified his request, she will go to Yue Yu with his query. Id.

87. A success Story -- Collaboration and Demand Management. See Ex. P at BMS02207--02209. This email was from Lia Cutierrez, BMS Global Procurement, telling Tony Flemmich a successful story involving Plaintiff.

> "Hi, Tony—
>
> As we discussed, I think this would be a great story for your Bob Alt meeting – shows what we can achieve with excellent partners like Yue Y.
>
> She (Yue) deserves a spot award – don't know if consultants qualify."

The details of the Success Story were provided in the Attachment file –Success Story – Demand Management and Collaboration. See at Ex. P at BMS02208, *Background:* Ixempra Global Marketing wanted to use the money left over from their 2009 budget. Initially they

wanted to buy the Adelphi DSP for Breast Cancer. *Yue's (Plaintiff) response:* Yue reviewed their request and their information needs, then recommended the following: Buy the IMS Oncology Analyzer and the Synovate Therapy Monitor instead of the Adelphi DSP. **Benefit:** better methodology resulting in more relevant data, broader coverage (US + other countries), better pricing. Yue engaged Global Procurement throughout the process. GP negotiated with the suppliers resulting in huge cost avoidance while meeting the Mercury deadlines. Id.

**BMS Core Behavior:** Collaboration and Teamwork between MR and GP. Innovation—looking at bigger picture (data needs) and finding alternatives to suggested solution. Performance-achieved best value (quality x price) while meeting BU deadlines.

**Direction communications.** Results: Savings for GM Ixempra: $464,109. Id.


**EVRI PRELIMINARY POSITION DEVELOPMENT PROJECT**

88. EVRI was biological compound developed by BMS targeting three cancer receptors: EGFR, HER2 and VEGFR.

89. The EVRI Preliminary Position Project (EVRI Project) was to learn insights about how to position the EVRI among available oncology biological compounds in its commercialization phase.  Most oncology biological compounds only target one cancer receptor.

90. The one compound with potential of targeting three cancer receptors presented great challenges to BMS whether to position EVRI as a multiple target agents or sole target agent. If multiple targets are chosen, how to advocate the novel concept to the oncologists.

91. The complexity of EVRI Project determined a collaborative team approaching involving several functions of BMS and many BMS employees.

92. The functions involved were: Marketing, Market Research, Medical, Research & Development, Clinical Trial and Medical Communications.

93. The employees were: Linda Kozick, ,Dan Guo, William Hunt (Marketing); Shinta Cheng, Tai Wong (Research & Development);  Lisa John (Medical Communications),   Mark Salvati (Medical); Eric Sbar (Clinical Trial), and Holly McGrath,  Yue Yu (Market Research).

94. McGrath discussed the EVRI Project with Plaintiff, provided guidance and instructions to Plaintiff before the Kick-Off Meeting. McGrath attended the Kick-Off Meeting and the following meeting. McGrath didn't attend other EVRI Project meeting until the final presentation. See Ex. G at 3-4; See Ex H at BMS00724-00725 (marketing excellence Link and positioning guide).

95. Project kick off meeting was held on Oct. 1, 2009 with only six of the above mentioned employees attending. Later along with the EVRI Project progressed, several other employees joined into the Project. Plaintiff was the lead for Market Research Team and leading the EVRI market research Project. See Ex. L at BMS00706.   At least ten BMS employees were participated and involved in the Project. Each member of the team had emphasized the points of view from his/her function. Almost everyone had his/her idea best supporting his/her function.

96.   After several team meetings, discussion and debate, the Team agreed on the Market Research Objectives. Then, Plaintiff developed MR plan. Plaintiff sent the MR Plan to McGrath and Marketing (Dan Guo) for approval. See Ex. I at BMS00786.

97.   After the Marker Research Plan for EVRI Project was approved by McGrath and marketing team, Plaintiff sent out Request for Proposal (RFP) to several market research vendors.

98.   Several market research vendors including GfK submitted proposals for bidding the EVRI Project. McGrath instructed Plaintiff to commission the EVRI Project to GfK.

99.   As a Market Research vendor for the EVRI Project, GfK was responsible for drafting discussion guide, recruiting research subjects, fielding interviews and interview related

logistics, paying honorarium to subjects, draft topline report, and providing final written report.

100. Plaintiff was responsible for managing GfK to ensure the quality of discussion guide, interviewing related logics on time, accuracy of data collection, and quality of topline report and final report. Plaintiff was responsible for transforming the GfK's report into a presentation, then, presenting to the broader team.

101. After the vendor was chosen, the team was charged with providing stimuli for the interviews. Soon after, the team encountered some issues. First of all, there was confusion of each function's responsibilities. The Project needed research clinical and medical stimuli which became product profiles and marketing stimuli which include product features, functional benefits and reasons to believe. The team wasn't sure which function should provide clinical stimuli, which function should provide medical stimuli, and which function should provide product profiles. Mark Salvati and Shinta Cheng suggested Dan Guo take responsibilities for assembling stimuli with help and inputs from all functions.

102. The team couldn't agree on product profiles. There were product profiles used in EVRI previous market research, some team member suggested use the existing product profile, others recommended update the profile with newly available information. The complexity and details of the product profiles were also hotly debated among team members. See Ex. L at BMS01669, Mark Salvati, the Medical lead on this Project, commented "from my discussion with the team, the main concern stems from the fact that the current product profiles are highly detailed and contain more information around the profile of the competition product than EVRI" Id.

103. Product features, functional benefits and reasons to believe were discussed and debated among team members via several team meetings and later the team agreed on the product features, functional benefits and reasons to believe.

104. Dan Guo wanted and insisted on to test three product profiles in 50 minute interview. In addition, Dan Guo wanted to discuss both Brest cancer and lung cancer indications with the physicians who treat both tumors. Plaintiff disagreed. Plaintiff's market research experience told her that testing of three profiles in one interviews were not feasible and the research wouldn't achieve the objectives.

105. Plaintiff tried several times to explain the basics of market research interview requirements, timing and flow of discussion, and impact of lengthy and complexity of stimuli. Plaintiff reminded Dan Guo that presenting multiple product profiles in a 50 minute interview could cause subject's mental and/or physical fatigue which would turn off subject's interest, therefore, unreliable results.

106. Dan Guo's request of presenting three product profiles demanded a total of 11 pages of discussion guide and 15 pages of stimuli to be reviewed and discussed in a 50 minute interview. It was almost certain that both moderator and subject would be burned out during the interview. See Ex. K at BMS00657-01 to BMS00657-10, at BMS00684-01 to BMS00684-15.

107. Despite of Plaintiff's explanation, PlainDan Guo pushed his idea of testing three product profiles. Dan Guo asked McGrath to intervene.

108. On Dec. 11, 2009, McGrath called Plaintiff into her office around 9:30AM. McGrath told Plaintiff that Dan Guo came to see her earlier in the morning and told McGrath that Plaintiff didn't want to take his advice on discussion guide and number of product profiles used as stimuli. McGrath told Plaintiff that Dan Guo wanted McGrath to intervene.

109. Plaintiff explained to McGrath that the request of testing three product profiles and combining two tumor types into one interview session violated the rule of basic marketing research. McGrath agreed the three product profiles were too much for one interview. However, McGrath told Plaintiff that market research function had to make marketing team happy.

McGrath told Plaintiff "let us change the discussion guide to make him happy". McGrath phoned Jigisha Shelat to come to her office brainstorming. McGrath almost abandoned the outline of discussion guided which was agreed by all functions and started to draft a new discussion guide.

110. December 12, Dan Guo acknowledged to his colleagues Eric Sbar, Shinta Cheng and Mark Slavati that "Holly/Yue tried to cut down the questions to focus only key ones. In light of the interview time (50mins), the previous version is too ambitious." See Ex. L at BMS00520. Dan ignored Eric Sbar's request of reviewing the final discussion guide. Id.

111. On December 12, 2009, McGrath came up with a fancy discussion guide with Bubble charts she borrowed from another market research vendor. Dan Guo was very happy with McGrath's intervention and new discussion guide.

112. On December 14, 2009, Pilot interview started in Washington D.C. McGrath observed the interviews via live streaming at her office in New Jersey. The physicians didn't respond well to the discussion guide developed by McGrath. At the end of Pilot day, McGrath held a conference with Plaintiff, Joan Baume, the moderator, Yoko Okamato, the EVRI Project lead and Dan Guo to discuss the results from Pilot. The team concluded the discussion guide didn't generate expected responses and interests from physicians and revision of discussion guide was needed. The team agreed upon what changes were needed. Yoko took the lead to revise the discussion guide. Plaintiff flew out to Chicago for the new fielding day.

113. The revised discussion guide was very similar to the one McGrath made Plaintiff abandoned.

114. In light of the disagreement, confusion and last minute change, and revision, EVRI Project's fielding went well. On December 15, 2009, McGrath commented Plaintiff "You are doing a good job, Yue. This has been a tough project for a variety of reasons, and we'll talk more about that. But I didn't want you to worry." See Ex. L at BMS00892. After this communication, McGrath rarely observed any interviews via streaming.

115. Dan Guo didn't have any disagreement or dissatisfaction, or demand for EVRI Project after the Pilot testing day in D.C. on December 14, 2009. Dan Guo observed some interviews via live streaming in New Jersey during the fielding period. Plaintiff didn't receive any comments from other team members after Dan's email to Eric, and all. See. Ex. L at BMS00520.

116. Plaintiff sensed that McGrath felt a little jittered. McGrath rushed to change discussion guide to please Dan Guo; the testing from the fielding indicated the changes were not warranted. Nonetheless, Plaintiff could understand McGrath's move in that McGrath had no oncology market research experience when she started her current role as Director of Global Oncology Market Research in earlier 2009. It was easy to give in to a demanding oncology marketing director when she was lacking of experience. Plaintiff didn't give it much thought over this discussion guide change incident and McGrath's lack of experience.

## XL 184 FRAME OF REFERENCE PROJECT

117. XL184 was a small molecule inhibitor of the RET, Met and VEGFR2. It was developed by Exelis.

118. At the time relevant to this matter, BMS and Exelis were collaborating on pre-commercialization of XL184.

119. XL184 had showed shown some positive effect to reduce brain tumor growth. BMS and Exelis wanted to test whether XL184 was effective for other tumors such as prostate cancer and gastric cancer.

120. XL184 marketing team wanted to conduct a primary market research to obtain insights on XL184's value proposition comparing to the marketed biological agents who treat the same types of cancers as XL184 intended.

121. The XL184 Frame of Reference Project (XL184 Project) was kicked off after Adrienne Ross; VP of XL184 marketing had discussion with McGrath and Plaintiff in October 2009.

122. A team was assembled for XL184 Project. Some of the team members are: Adrienne Ross, Jill Orosz, Shefali Shah (marketing), McGrath and Plaintiff (market research), medical people from both BMS and Exelis. At the time of Project kicked off, Jill Orosz was on maternity leave. She returned to work in December 2009. Corbet ad agency later joined the team also.

123. The Team agreed on the Market Research Objectives in October 2009. The focus of the MR research objectives were the efficacy and safety offered by XL184 comparing to its value proposition, and how it would be regarded in the real marketing condition. Plaintiff drafted market research plan for XL184 Project and provide it to McGrath, Adrienne Ross and Shefali Shah (marketing at Exelis) for approval; Ms. Orosz was on maternity leave.

124. After the Team approved the Marker Research Plan for XL184 Project, Plaintiff sent out RFP to market research vendors.

125. Several market research vendors including GfK provided proposals for bidding the XL184 Project. McGrath instructed Plaintiff to commission the XL184 Project to GfK.

126. As a Market Research vendor for the Xl184 Project, GfK was responsible for drafting discussion guide, recruiting research subjects, fielding interviews and interview related logistics, paying honorarium to subjects and providing final written report.

127. Edwin Rupert was the Project lead and moderator at GfK.

128. Edwin was in charge of developing discussion guide with the assistance of Plaintiff. The Discussion Guide was provided to marketing team and ad agency for comments.

129. XL184 marketing team and medical group provided research stimuli.

130. The pilot fielding was scheduled to start on Dec. 22, 2009 in San Diego. Plaintiff flew to San Diego on Dec. 20 to prepare for the fielding. However, the scheduled pilot fielding had to be cancelled due to Edwin Rupert's poorly planned travel arrangement.

131. The cancellation of scheduled pilot not only set back XL 184 Project schedule at least two weeks, but it also increased operation cost.

132. After the fielding cancellation, Plaintiff requested GfK to have someone else replace Edwin Rupert as its Project lead and moderator.

133. Plaintiff had to reschedule the pilot fielding to January 2010.

134. On January 7, 2010, XL184 Project Pilot fielding was kicked off in Fort Lauderdale, FL. Ms. Orosz and Shefali Shah and several employees of Corbet ad agency observed the interviews in person. After first two interviews were over, Ms. Orosz and Ms. Shah pulled Plaintiff to the side and demanded to change the discussion guide. Plaintiff questioned them the reason for changing in that marketing team was ok with the discussion guide. Ms. Orosz told Plaintiff that the marketing team wanted to hear more discussion about the link of Mechanism of Action (MoA) and value proposition.

135. Plaintiff reminded Ms. Orosz that past market research projects had confirmed multiple times that physicians are not interested in MoA. Efficacy and Side Effect are keys to all new medicines. In the oncology area, they are even more relevant.

136. Ms. Orosz and Ms. Shah insisted on emphasizing the link between MoA and value proposition despite Plaintiff's explanation.

137. Plaintiff called McGrath to obtain her advice. McGrath advised Plaintiff to change the discussion guide to the marketing team's satisfaction in that marketing team is the group which pays bills for market research projects. McGrath instructed Plaintiff to revise MR Plan with changed Objectives. She told Plaintiff to obtain marketing's approval of new MR plan before revising discussion guide.

138. Plaintiff did as McGrath instructed. Marketing team approved the changed MR plan. A revised discussion guide was developed and the rest of fielding continued.

139. On January 12, 2010, during her weekly one-on-one meeting with McGrath, Plaintiff
expressed her concerns that XL184 Project wouldn't be able to achieve its object since the
marketing team was fixated on MoA. McGrath told Plaintiff that sometimes marketing team
only wants to hear what they want to hear. Market Research had to yield to marketing since
money talks. See Ex. G at 10.

140. Ms. Orosz considered XL184 Frame of Reference Project as MOA Research. See Ex. Mc at
BMS02530. On February 24, 2010, when Ms. Orosz was asked what projects she needed
Plaintiff to finish, she replied "1, Completion of MOA research (final/presentation). As you
note, Yue may be finishing this project since she had started." Id.

141. The result from XL184 once again confirmed physicians didn't care about MoA. In March
2010, when the final report states the drivers of clinical usage and interests are efficacy and
safety, not MoA. In addition, the report also states physicians don't relate MoA to the
product's proposition. See Ex. Mc at 9.

142. The MoA focused XL184 Project also presented challenges to Plaintiff and GfK on how to
provide recommendations without exposing Marketing Team's failure of focusing on MoA.
See Ex. Mc at BMS02449. This is an email from Delghiaccio to McGrath. Delghiaccio wrote:
"I know that you are acutely aware that MOA in and of itself is not a driver of use--- it is
whether or not the product is perceived efficacious and safe." Delghiaccio further commented:
"As you know, the brand team had taken a decided focus on the perceived value of MOA for
this research. That said, there are other take-aways from the research that we can elucidate fro
you" The statement from Delghiaccio implied that he would find something to fill the void of
MoA created.

143. On March 18, 2010, Plaintiff sent out XL184 Project final report to Ms. Orosz and Ms. Shah.
Soon after the Report was sent, Ms. Orosz called Plaintiff and told her the report would get
her fired. She told Plaintiff that the Report sounded like marketing team insisted on testing

MoA even thought marketing knew physicians didn't care about it. In particular she was troubled with the Key Learning Statement: "Across all the four tumors discussed, the drivers of clinical usage and interest are efficacy and safety; not MoA—Physicians don't relate MoA to the product's proposition." See Ex. Mc, at 9. Ms. Orosz told Plaintiff was too direct and asked to reword it.

144. Ms. Orosz further commented that there were too many things in the Report stating MoA doesn't work. Ms. Orosz asked Plaintiff to downplay the fact that no interest shown in MoA from physicians. Plaintiff agreed to tweak the wording, but Plaintiff warned Orosz there wouldn't be significant changes in that the Report shouldn't be deviated from what findings collected from fielding.

145. Gfk finished the final report of XL184 Frame of Reference Project and presented to the marketing team after Plaintiff's termination. Ms. Orosz was not satisfied with the GfK's report, she complained in her email to McGrath.

146. Ms. Orosz didn't think McGrath a good market researcher. Ms. Orosz stated that based on the projects that she worked with McGrath, she found it difficult to obtain the information required for the business. See Ex. N (Orosz Dep. 15:6 – 16:4)

### The BREAST CANCER PROJECT

147. Susan Heinberg was the marketing for the Breast Cancer Project. Before the data was purchased, Ms. Heinberg provided Plaintiff with details to guide MR (RFP) proposals for vendors' reference. See Ex. R at BMS01439. Plaintiff used the email as a requirement to vendors for their proposal and later data delivery.

148. Plaintiff worked with BMS Global Procurement Group to negotiate and purchased data sets from IMS Healthcare and Synovate. See Ex. P at BMS02207—02209, Success Story.

The funding used for purchasing the data for the Breast Cancer Project was the pooled in from secondary data purchase budget and other market research budget.

After the data is purchased, IMS had to pull the data out its database in order to provide data in a workable format. IMS relies on its UK team to run the data production. Soon after the data was purchase, IMS started to experience delay in its UK data production center. It had become a routine that Plaintiff received some data after waited for a week or two weeks. Then, Plaintiff was promised to get the data in next two weeks. Then, notice came for delaying delivery. Due to the lack of data, the scheduled meetings had to be cancelled and rescheduled several times. See Ex. R at BMS00311, on March 8, 2010, Plaintiff notified marketing team that IMS team couldn't produce the data as requested. On March 15, 2010, See Ex. R at BMS01998, Plaintiff notified marketing team that IMS again hadn't had the treatment flow data from its UK team. Plaintiff also warned the team the scheduled meeting to discuss data would be cancelled if IMS US can't produce data. Ms. Heinberg requested to reschedule the meeting with IMS during the week of March 22, 2010 and meeting with Synovate team during the week of March 29, 2010. See Ex. P at BMS02453.

Bernadette of IMS provided a partially finished Deck to Plaintiff. She also informed Plaintiff that her computer kept crashing and she wasn't sure how the individual regimens within each of the groups should be presented. Id. However, Plaintiff doesn't have the response to the email sent by Bernadette at BMS02453, therefore, Plaintiff can't recall what's situation or Plaintiff's response to it. In the email exchanges, Plaintiff asked Bernadette when she expected the data from UK. Her answer was "They haven't given me a definitive answer; just that they're working on it." Id.

149. Synovate, another data provide for Breast Cancer Project also run into some data issue in addition to its scheduling issues. Two scheduled meetings had to be rescheduled due to the scheduling conflict.

150. Synovate analysis didn't' finish until later May or early June 2010. In an email from McGrath to Heinber on May 17, 2010, McGrath instructed Heinberg to copy all email forward to

Neeraj Nadkarni "please copy Neeraj on these messages-he is taking over the project from me". See Ex. R at BMS00329.

## THE MARKET RESEARCH EMPLOYMENT OPPORTUNITY

151. On January 6, 2010, at a Marketing Research Global Oncology Staff Meeting, Dan Stults, Senior Director of Marketing Research, announced that the department had approved an addition headcount for a new full-time marketing research position reporting to McGrath. Dan Stults stated that the full time position may have impact on Plaintiff's assignment at BMS.

152. Plaintiff was interested in pursuing the full time position. On January 6, 2010, Plaintiff told Delghiaccio about the new position on the telephone while she was driving to the Newark Liberty Airport to travel to Ft. Lauderdale, FL. Delghiaccio agreed to speak to Dan Stults regarding Plaintiff's interest in the following days when he and Dan Stults have lunch. Plaintiff was excited and upbeat after the conversation with Delghiaccio.

153. Plaintiff traveled five days to conduct XL184 market research project from January 6 to January 11, 2010.

154. On January 12, 2010, Plaintiff had weekly one-on-one meeting with McGrath. See Ex. G at 10. (Plaintiff's meeting note). The first item on the agenda was "head count". Plaintiff first asked whether the new position would impact her assignment. McGrath's answer was very likely since the new position would take over the consultant's responsibilities. Plaintiff told McGrath that she was interested in the full time position and wanted to pursue it. McGrath welcomed Plaintiff's interest and stated she had on objection to support Plaintiff's application unless the Contract with BMS prevented her hiring. McGrath also told Plaintiff that she would place Plaintiff into the candidates' pool and

request Plaintiff to go through the interview process as other candidate would do. Plaintiff had no objection.

155. There was not discussion between Plaintiff and McGrath regarding the position for the following several days.

156. On January 19, 2010, Delghiaccio wanted to have a telephone update with Plaintiff. The meeting was set up at 8:30AM on January 20, 2010. It was bit unusual to have a telephone conference with Delghiaccio in that GfK finished XL184 Project fielding and was draft final report. He would just call Plaintiff if his report ran into problems as he did before.

157. On January 20, 2010, Delghiaccio told Plaintiff that McGrath wanted to end her assignment as soon as possible. Plaintiff was shocked to hear the news. Plaintiff burst into tears. Delghiaccio explained that Dan Guo demanded McGrath to remove Plaintiff from BMS, not McGrath's idea. McGrath told Delghiaccio that Plaintiff had exhibited skills of a strong market researcher and she had no doubt that Plaintiff would continue to do a good job. However, McGrath told Delghiaccio that it would be a lost battle if marketing team members don't want Plaintiff to be at BMS.

158. Later on the same day, January 20, 2010, Plaintiff had weekly one-on-one meeting with McGrath. Plaintiff discussed the "Dan Guo situation". McGrath confirmed it was Dan Guo who requested to remove Plaintiff from BMS. Otherwise, McGrath wouldn't have done that.

159. Plaintiff told McGrath that she could not understand why Dan Guo asked to remove Plaintiff in January one month after EVRI Project's fielding. Plaintiff told McGrath that she would like to speak to Dan Guo to work things out. McGrath discouraged Plaintiff from meeting with Dan Guo. McGrath said "let it go". Plaintiff couldn't help but crying. See Ex. G at 11. (Plaintiff's meeting note).

160. Plaintiff left McGrath's office with tears. Dolores Slayton, the assistant saw the tear and followed Plaintiff to her working station. Plaintiff didn't want to tell Dolores what happened. Dolores took Plaintiff to the nearby restroom. At there, Plaintiff told Dolores that McGrath wanted to terminate Plaintiff's assignment. Dolores was surprised to hear the news. She commented that Plaintiff had worked her butt off for BMS, she thought McGrath would give the full time position to Plaintiff.

161. During the night of January 20, 2010, Plaintiff couldn't fall into sleep but think about how Dan Guo wanted to remove Plaintiff from BMS. It would make more sense if Dan Guo requested Plaintiff's removal in the middle of EVRI Project Product Profile testing debate. Now, it was almost six weeks later, why he wanted to remove Plaintiff from BMS. It didn't make sense that someone would go this far to get someone fired.

162. Next day, January 21, 2010, Plaintiff ran into Dan Guo and told Dan that her contract wouldn't be renewed. Dan Guo was surprised to hear the news. Plaintiff told Dan that McGrath claimed that Dan Duo requested to remove Plaintiff from BMS. Dan Duo told Plaintiff it was not ethical to make up things and use his name when Dan heard that he was used as the excuse. Plaintiff concluded McGrath lied to her about the assignment situation. Later, documents from BMS confirmed McGrath lied to Plaintiff about Dan Guo's claim. See Ex. S at BMS02507-02508.

163. On January 24, 2010, Plaintiff wrote a letter to Delghiaccio questioning the true reason for her assignment's termination. Although Plaintiff wasn't sure the true reason, she knew it must have something to do with her interest and desire of becoming a full time employee of BMS. See Ex. S at 1. This was the first time Plaintiff challenged McGrath's motive of rejecting Plaintiff's application.

164. On January 28, 2010, Plaintiff had weekly meeting with McGrath. During the meeting, for the first time ever, McGrath started to comment on Plaintiff's work style. McGrath reiterated that Plaintiff's performance was good. But she wanted Plaintiff to knowledge the requests from her by reciting the requests instead of saying "yes, I understand."

165. On February 2, 201, McGrath told Plaintiff that she had to copy her on every secondary analysis done for marketing team. McGrath told Plaintiff that she wanted to see the work product. Plaintiff had no objection to McGrath's request in that Plaintiff discussed and report secondary data analysis requests from marketing team to McGrath weekly on during weekly meetings.

166. On February 12, 2010, Delghiaccio called Plaintiff to discuss working at BMS. Plaintiff told Delghiaccio that she was interested in pursuing full time positions with BMS and she was going to apply the open positions including the one with McGrath's group. Delghiaccio commented, "why not!" But, he immediately asked whether Plaintiff would be comfortable to work with McGrath after the recent event? Plaintiff's response was no problem. She further stated "the devil you know is better than the devil you don't know. It goes both ways."

167. On February 17, 2010, Plaintiff organized a meeting with Susan Heinberg, Jamie Foley, Denise Pettiecord to review and discuss "ER+ data corresponding to Breast TSG key questions." At Beginning of the meeting, Ms. Heinberg told Plaintiff that she just heard that Plaintiff was leaving BMS. Susan commented that she has been very satisfied with Plaintiff's work. Ms. Heinberg stated that the several projects Plaintiff has worked on have been great, timely and professional. She was very grateful and did not want Plaintiff to leave BMS. Later, Jamie asked when Plaintiff was leaving. Plaintiff told Jamie, Susan and Denise that she was interested in pursuing the full time position with McGrath's

group. Ms. Heinberg said it was a good idea and she would support Plaintiff's application. Ms. Jamie Foley and Denis all gave Plaintiff their support.

168. On March 1, 2010, Plaintiff formally applied the Associate Director, Oncology Market Research Position via BMS's website. After applied the full time position, Plaintiff sent an email to McGrath to request McGrath to consider Plaintiff's application. McGrath responded to discuss the matter in person. See Ex. S at 2-3 (Plaintiff's letter to McGrath)

169. On March 4, 2010, McGrath discussed Plaintiff's application. McGrath was upset that Plaintiff applied the Position online. McGrath told Plaintiff that she informed the BMS staff manager not to consider Plaintiff candidacy. Holly further commented that market team members provided negative feedback about Plaintiff's performance and she can't allow Plaintiff to go through interview process. McGrath further commented that the candidates whom she interviewed were more qualified than Plaintiff.  At this moment, Plaintiff confirmed her suspicion there was something deeper McGrath didn't want to admit. Thus, Plaintiff asked McGrath directly the reasons she did not want to consider Plaintiff. McGrath responded, "there are reasons". Then, Plaintiff pressed McGrath "Is that because I am a Chinese?" McGrath didn't deny it. Her body language and facial expression confirmed that being a Chinese was a factor for not being considered for the position Plaintiff applied.

170. March 8, 2010, McGrath cancelled all one-on-one meetings with Plaintiff, however, the hostile attitude Plaintiff and harassment continued and intensified.

171. Plaintiff believed McGrath discriminated her when considered her job application.

172. After Plaintiff challenged McGrath with discrimination allegation, McGrath retaliated Plaintiff by creating hostile working environment, took responsibilities away and eventually terminated Plaintiff's assignment.

**QUALIFICATION AND SKILLS REQUIRED FOR THE POSITION**

**CANDIDATE BMS AND MCGRATH HIRED**

**PLAINTIFF' S QUALIFICATION AND SKILL SET**

173. BMS and McGrath hired Neeraj Nadkarni to fill the position Plaintiff applied. Neeraj Nadkarni is not qualified for the position according to the Job Qualifications. See Ex. S at BMS00173 and McGrath's standards. See Ex. S at 5-6. (Neeraji Nadkarni's profie on Linkedin). Mr. Nadkarni had less than five years of experience before joining BMS, didn't meet the minimum 7 years of experience requirement; Mr. Nadkarni did not work at any pharmaceutical company, did not meet the industry requirement. In addition, Mr. Nadkarni did not have oncology working experience at all. He didn't meet the therapeutic requirement.

174. All the resumes produced by BMS indicate Mr. Nadkarni's experience and corresponding skills are the lowest among all applicants.

175. Mr. Nakharni is less qualified candidate than Plaintiff.

176. Most of all, the Position requires the candidate must have demonstrated ability to leverage high-value marketing research to enhance and improve decision making. He/she must be adept at developing marketing research plans/budgets which align with the top business priorities....strong communicate   skills..." Mr. Nadkarini didn't have the industry experience to support the development of the required skills. Many of these skills required for the job only could be developed through working at a pharmaceutical company acting like a client. See Ex. S at BMS00173.

177. Mr. Nadkarini had communication issues. McGrath summarized the problems in her email communication to Dan Guo, Sanjaya and Jane Stokes. See Ex. S at BMS00701-00702, (Comments by McGrath, Sanjaya Shunglu and Dan Guo). McGrath commented Mr. Nadkarni

doesn't have a lot of oncology experience (as a matter of fact, None oncology experience), so he would have need to get up to speed on the therapeutic area. McGrath further commented there was some concern that his communication style could be more dynamic/engaging. The feedback from Sanjaya Shunglu. Dan Guo was not very upbeat either. Mr. Shunglu had mixed impression of Neeraji. "impressive educational credentials but had a hard time living up to them. Discussed leading the positioning practice effort for ZS, but (he) couldn't provide the textbook definition. Seems analytical but not focused." Dan Guo seconded Sanjay's finding, he would give Neeraj a low-to-medium score on organizing thoughts. Id.

178. Plaintiff met every requirement on the job description See Ex. S, at BMS00173. But not even offered an interview.

179. The question is why McGrath hired the unqualified male, non-Chinese candidate instead of Plaintiff?

180. There were three Caucasian women interviewed for the position Plaintiff applied besides the hired candidate.  The three Caucasian women candidates didn't have higher qualifications than Plaintiff.

## MCGRATH USED PERFORMANCE ISSUE AS A PRETEXT TO TERMINATE PLAINTIFF

181. Plaintiff informed McGrath her desire of becoming a full time employee on January 12, 2010.

182. There were no performance issues of any type prior to January 12, 2010.

183. McGrath decided to terminate Plaintiff's contract as early as Jan 19, 2010. See Ex. BMS02504. McGrath instructed Delghiaccio to solicit Basya Gale to take over Plaintiff's work.

184. The Performance Issue was a pretext to terminate Plaintiff at BMS. All claims by McGrath of Plaintiff's poor performance were NOT supported by any written communications. During her Deposition on Dec. 15, 2012, McGrath admitted several times that she had no written documents to support the poor performance claims. See Ex. H (McGrath Dep. 55:15 – 56:4; 62:16 - 62: 25; 67:17-67:22; 96:10 – 96:23.)

## CONTRACT EXTENSION TO END OF 2010

185. Plaintiff believes that she entered into an enforceable employment contract with BMS because BMS was her employer who received her service. Plaintiff was an employee of BMS per its internal policy. See Ex. J. (BMS Direct)

186. In November 2009, Plaintiff was busy working on the 2010 market research budget for EVRI and Ixempra as the rest of her group did. During the budget discussion, Plaintiff asked McGrath to extend her contract to the end of 2010. McGrath agreed to do so. McGrath also told Plaintiff that the money for Plaintiff for 2010 had been agreed upon and allocated by EVRI and Ixempra marketing team. See Ex. E at 1-2. (2010 Ixempra Market Research Budget and 2010 EVRI Market Research Plan).

187. The weekly one-on-one meeting calendar entry also confirmed the agreement of Plaintiff's contract extension. See. Ex. E at BMS00898. McGrath must have told Dolores Slayton, the change of Contract term since Slayton scheduled Plaintiff and McGrath weekly meeting to December 2010.

188. Delghiaccio wrote an email to McGrath on January 11, 2010. See Ex. S at BMS02315. In this email, Delghiaccio referred Plaintiff as "esteemed consultant, Yue Yu". Delghiaccio also wrote, "you and I should talk about proposed tenure moving forward….. Depending upon how long you would like to keep Yue as part of the team, we will need to discuss requisite logistics for making that happen." Id. This document indicates Plaintiff's contract extension was being

discussed, and Delghiaccio was awaiting McGrath's green light to initial a new round of SOW approval process. Id.

189. McGrath only changed her mind of renewing Plaintiff's contract after Plaintiff expressed her desire of becoming a full time employee of BMS. On or about January 15, 2010 when McGrath asked Delghiaccio to find Basya Gale to replace Plaintiff. See Ex. S at BMS02502.

190. All documents supported the contract extension claimed by Plaintiff.

## DISCRIMINATION, RETALIATION

191. Plaintiff believes that Ms. McGrath did not consider Plaintiff for the Associate Director position because Plaintiff is Chinese and National origin of China.

192. On or March 4, McGrath had an in person discussion with Plaintiff. See Ex. S, at 4 (Meeting note). McGrath told Plaintiff that some candidates she interviewed are more qualified than Plaintiff, which later confirmed by produced resumes is false. When Plaintiff asked McGrath whether being Chinese is a factor of her decision denying Plaintiff's application, McGrath didn't deny verbally and her body language confirmed the discrimination is a factor.

193. After March 4, 2010's confrontation, McGrath started obvious retaliation. For example, McGrath cancelled all reminding one-on-one meeting with Plaintiff. McGrath also humiliated Plaintiff in front of employees of GfK which was the vendor of EVRI and XL184. McGrath also striped Plaintiff's supervisory responsibilities of vendor GfK. McGrath let GfK finish the EVRI and XL184 project reports without proper supervision from Plaintiff or other BMS employees.

194. The heavy retaliations came in two parts: first of all, McGrath changed her mind of renewing Plaintiff's contract from April to December 2010 even thought she agreed to and told Dolores Slayton and Delghiaccio. This is breach of contract and retaliation. The

second retaliation is to terminate Plaintiff's initial contract before it reached the term. It is another breach of contract and retaliation.

### Holly McGrath and Delghiaccio

195. Delghiaccio was an employee of GfK at the time relevant to this matter. Delghiaccio was one of several account managers at GfK concerning BMS business.

196. Delghiaccio received commission for any business he developed and generated at BMS. The pay structure commission was about 1.5% -2% of total gross margin. Delghiaccio stated that he generated about $4.5 Millions business from BMS in two to three years. See. Ex. D. (Delghiaccio Dep. 17:6-19:25).

197. Delghiaccio also received commission on "recruiting Plaintiff" project. Delghiaccio received commission on the EVRI and XL184 McGrath instructed Plaintiff commissioned to GfK.

198. Delghiaccio could receive about $90,000 of commissions earned from BMS business based upon two percent of $4.5 million business.

199. McGrath is a white woman. She is about 5 feet tall and weights 100 pounds. McGrath was in the middle of divorce procedure when Plaintiff was working at BMS. See Ex. H (McGrath Dep. 5:7-5:13)

### THE COMMENCEMENT OF THE PRESENT ACTION

200. On or about September 7, 2010, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated against because of her race and national origin and was terminated in retaliation after confronting the discrimination factor with McGrath.

201. On or about June 24, 2011, the EEOC issued a right to sue letter indicating that Plaintiff's allegations did not establish a violation of federal antidiscrimination laws, and granting Plaintiff the right to file a private cause of action.

202. On or about September 20, 2011, Plaintiff filed her Complaint commencing the present action. Subsequently on June 25, 2012, Plaintiff filed an amended Complaint.

Respectfully Submitted

Yue Yu

By:_____

Yue Yu

*Plaintiff*

Dated: April 15, 2013

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on this 16th day of

April, 2013 upon the following counsel of record via carrier service.


David M. Wissert
**LOWENSTEIN SANDER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 422-6707
dwissert@lowenstein.com


Amy Komoroski Wiwi
**LOWENSTEIN SANDER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2336
Facsimile: (973) 422-6707
awiwi@lowenstein.com


Yue Yu