UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2013 APR 16  PM 5 18

)
)
)                              Civil Action
YUE YU,                        )
)
                              )     DOCKET NO. 3:11-cv-05446-PGS-DEA
          PLAINTIFF,          )
)
  vs.                         )
)
HOLLY MCGRATH                 )
BRISTOL-MYERS SQUIBB          )
)
          DEFENDANTS.         )
                              )

**PLAINTIFF'S RESPONSIVE STATEMENT TO DEFENDANTS UNDISPUTED
MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, Plaintiff, hereby submits Responsive Statement to Defendants' Statement of Undisputed Material Facts in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

## THE PARTIES

1. BMS is a global biopharmaceutical company specializing in the discovery, development, and marketing of medical therapies. See Declaration of Amy Komoroski Wiwi ("Wiwi Decl."), Ex. A (BMS Website). BMS is headquartered in New York City and has manufacturing plants and research and development centers throughout the world, including in Lawrenceville, New Jersey. See id., Ex. A.

   Response: Agree

1

2.  Ms. McGrath was employed by BMS from November 2000 to December 2012. See id., Ex. B (McGrath Dep. 9:4-9:9). At all times relevant to this case, Ms. McGrath served as BMS's Director of Global Oncology Marketing Research. See id., Ex. B (McGrath Dep. 9:14-10:12).

    Response: Agree

3.  Plaintiff, Yue Yu ("Plaintiff"), is an individual residing at 105 Park Place, Kearny, New Jersey. See id., Ex. C (Yu Dep. 23:19-23:20).

    Response: Agree

### PLAINTIFF'S PLACEMENT AT BMS

4.  At all times relevant to this matter, BMS had an ongoing business relationship with marketing research vendor GfK Healthcare, LP ("GfK"), see Wiwi Decl., Ex. D (Delghiaccio Dep. 65:23-67:2), pursuant to which GfK provided various marketing research services for BMS including, without limitation, marketing research facilitation and coordination, and on occasion, providing temporary consultants to manage short-term marketing research projects. See id., Ex. E (Statement of Work at 1); id., Ex. D (Delghiaccio Dep. 15:6-15:23, 65:23-67:2).

    Response: Disagree. At the time relevant to this matter, GfK served as a head hunter and/or recruitment firm in connection with Plaintiff's placement at BMS. See Plaintiff's Ex. A. GfK recruited Plaintiff on behalf of BMS.

     In addition, the statement made by Defendants' Ex. E (Statement of Work at 1) and Ex. D (Delghiaccios Dep. 15:6 -15:23, 65:23-67:2) didn't have reference of GfK providing consultant to manage short-term research projects for BMS.

5.  At all relevant times, Robert Delghiaccio was the account manager at GfK who was responsible for all marketing research work performed by GfK for BMS. See id., Ex. B (McGrath Dep. 19:19-20:1); id., Ex. D (Delghiaccio Dep. 17:8-17:22).

    Response: Disagree. Delghiaccio was one of several account leads at GfK managing BMS oncology market research related business. He was the contact person for GfK's two groups in

New Jersey. GfK v2 company which is located in Pennsylvania, has separate account manager/contact person with BMS. More important, GfK assignment its employees to lead market research projects commissioned by BMS. For example, Yoko Okamao was the Lead for EVRI Project. See Yu Statement ¶112.

6. In or about September 2009, Ms. McGrath requested that GfK identify a marketing research consultant to manage certain marketing research projects for BMS's Global Marketing Team in its Lawrenceville, New Jersey office. See id., Ex. D (Delghiaccio Dep. 14:12-14:20, 15:6-15:9); Ex. E at 1.

Response: Disagree. In July 2009, Delghiaccio started to solicit candidates for a market researcher position with BMS. See Plaintiff's Ex. A. This indicates the request from McGrath must have been prior to or in July 2009.

7. GfK contacted a technology recruiting and staffing agency, Scientific Search, to identify a candidate for the consulting assignment at BMS. See id., Ex. D (Delghiaccio Dep. 14:12-15:17).

Response: Disagree. GfK worked with several recruiting placement firms to identify candidates for the consultant position at BMS. See Ex. D (Delghiaccio Dep. 16:6-16:14).

8. Scientific Search identified Plaintiff, and contacted her directly. See id., Ex. C (Yu Dep. 55:5-55:25); id., Ex. D (Delghiaccio Dep. 14:21-15:9).

Response: Disagree. Scientific Search initially contacted Plaintiff for the position with BMS. After Plaintiff's resume was submitted to BMS, BMS managed Plaintiff's interview process. See Yu Statement ¶¶ 1-6 and Ex. A.

9. P. James Jenkins, Vice President and Practice Lead, was the primary contact at Scientific Search with regard to the BMS assignment. See id., Ex. F (Email from J. Jenkins); id., Ex. G (Email from J. Jenkins at PF00000075); id., Ex. H (Email from Y. Yu); id., Ex. D (Delghiaccio Dep. 14:21-14:23).

Response: Agree.

3

10. Mr. Jenkins introduced Plaintiff to Mr. Delghiaccio at GFK, who in turn introduced Plaintiff to Ms. McGrath at BMS. See id., Ex. I (Scientific Search-GfK Contract at 1-2); id., Ex. D (Delghiaccio Dep. 14:12-16:22).

Response: Disagree. Mr. Jenkins submitted Plaintiff's resume to GfK, then, GfK submitted Plaintiff's resume to BMS. Plaintiff met McGrath on August 12, 2009 during her interview with BMS. Plaintiff didn't meet with Mr. Jenkins and Mr. Delghiaccio until September 21, 2009. See Yu Statement ¶¶ 3-8.

11. Ms. McGrath interviewed and then selected Plaintiff to provide the requested consulting services on behalf of GfK. See id., Ex. C (Yu Dep. 67:1-67:4, 69:8-69:12); id., Ex. B (McGrath Dep. 102:21-103:2).

Response: Disagree. Other two BMS employees Dan Stults and Joey Li also interviewed Plaintiff. See Ex. A at 4.

12. BMS contracted directly with GfK for Plaintiff to provide the temporary consulting services by executing a Statement of Work (the "SOW") pursuant to an existing marketing research agreement between BMS and GfK. See id., Ex. E. (SOW at 1).

Response: Disagree. GfK owed cash refund to BMS for paid but not delivered services. However, GfK either didn't want to or couldn't issue cash refund to BMS directly. Thus, BMS had huge cash credit with GfK, but couldn't' get it back. BMS figured out a way to receive refund: BMS and GfK signed a consulting service agreement for GfK to provide consulting service to BMS. BMS would use the cash refund credit to pay for the consulting service. The truth is: GfK didn't provide any consulting service to BMS. Instead, BMS hired Plaintiff to provide consulting service; but Gfk paid for the service. The payment from GfK to Plaintiff would be treated as cash refund. BMS and GfK planned to use consulting service to exhaust all cash refund credit.

Therefore, the Contract between BMS and GfK is for cash refund purpose only. Plaintiff considers GfK a recruiter since it did find Plaintiff and successfully placed Plaintiff at BMS. See Yu Statement ¶¶ 17-18, 20, 38.

13. GfK entered into separate contracts with Scientific Search and Plaintiff individually. See id., Ex. I (Scientific Search-GfK Contract at 1); id., Ex. J (GfK-Plaintiff Contract at 1).

Response: Disagree. The contracts with either party were to payment purpose only. See Yu Statement ¶¶ 9-12.

14. Scientific Search did not contract with Plaintiff directly, but instead contracted with a company called Great & GuangDa Enterprise, Inc. ("G&G"), of which Plaintiff was President. See id., Ex. K; id., Ex. L; id., Ex. F (Email from J. Jenkins); id., Ex. C (Yu Dep. 33:20-33:24, 55:5-56:7); id., Ex. M (Business Gateway Status Report for G&G at 2).

Response: Disagree. The Contract between Scientific Search and G&G was for processing payment only for Plaintiff. However, the Contract ensured Scientific Search, a recruiter, to receive its finder's fee. Scientific Search is a recruitment firm and it didn't provide market research service nor receive market research product. See Yu Statement ¶¶ 12-14.

15. Plaintiff originally formed G&G for the purpose of distributing computer components, but she also used G&G to provide consulting services. See id., Ex. C (Yu Dep. 32:6-32:23).

Response: Disagree. Plaintiff hadn't engaged G&G to provide consulting business for several years prior to working at BMS. See Yu Statement ¶¶34.

16. Scientific Search provided Plaintiff with the option of becoming employed by Scientific Search directly during the period of the consulting assignment at BMS. See id., Ex. C (Yu Dep. 33:20-35:16).

Response: Disagree. Scientific Search didn't provide Plaintiff with the option of becoming employed by Scientific Search. Rather, it offered W2 to Plaintiff as a method of payment. See Yu Statement ¶¶ 12-14.

17. Instead, Plaintiff specifically chose to engage with Scientific Search through G&G -- and not in her individual capacity -- because Scientific Search offered to pay G&G a higher hourly rate under an arrangement where G&G assumed costs and responsibilities, such as insurance obligations, associated with the engagement. See id., Ex. C (Yu Dep. 33:20-35:22, 56:1-56:4); id., Ex. N (Emails from J. Jenkins & Y. Yu); id., Ex. K (Scientific Search-G&G Contract at 1, 3).

Response: Disagree. Plaintiff was offered and suggested the option of business to business payment which provides a higher rate. Plaintiff was told that in order for GfK and Scientific Search to receive their fees, the payment had to go through them. See Yu Statement ¶¶ 12-14.

18. BMS did not have any written contractual relationship with Plaintiff, Scientific Search, or G&G with regard to the consulting assignment. See id., Ex. C (Yu Dep. 63:2-63:9, 65:16-65:20, 107:4-107:8, 116:25-117:7, 179:23-180:16); id., Ex. O (Email from J. Jenkins).

Response: Disagree. BMS had an actual business and contractual relationship with Plaintiff in light of lacking direct written contract. BMS used the chain of contracts to receive cash refund from GfK, and used the chain of contracts to avoid its tax liabilities and benefit responsibilities. See Yu Statement ¶¶ 16-20, 22-28, 38.

**THE OPERATIVE CONTRACTS**

**THE SOW Between BMS and GfK**

19. The SOW between GfK and BMS was effective as of September 11, 2009, and extended only through "the earlier of (a) March 31, 2010 and (b) termination in accordance with the terms of the Agreement." See Wiwi Decl., Ex. E at 1. The SOW did not specifically address the possibility of extending the term of the SOW beyond March 31, 2010. See id., Ex. E.

Response: Disagree. Firs of all, the SOW is not a legal document in that it doesn't contain all required signatures. Secondly, the SOW is for BMS to receive cash refund and for payment process purpose.

20. The SOW provided a description of the services to be provided as well as the Company's expectations with regard to the quality of the project deliverables. See id., Ex. E at 1.

Response: Disagree. Firs of all, the SOW is not a legal document in that it doesn't contain all required signatures. Secondly, the SOW is for BMS to receive cash refund and for payment process purpose.

21. According to the SOW, the services were to be performed at BMS's Lawrenceville, New Jersey offices, where BMS would "provide work space, a telephone, building and hardware and software systems access only as necessary for the proper performance of services." See id., Ex. E at 1.

Response: Disagree. The SOW is not a signed legal document. It is for BMS to receive cash refund and payment process.

22. Under the SOW, BMS agreed to pay for services actually performed at the rate of $190 per hour, and in the event it specifically requested services requiring more than forty hours in a given week, BMS agreed to pay $205 per hour to GfK. See id., Ex. E at 2.

Response: Disagree. The SOW presented at Ex. E by defendants is unsigned copy without BMS's signature.

23. The SOW further provided a maximum limit on the cost of such services during the contract period and indicated that charges to BMS would be offset against pre-existing credits BMS had with GfK until such credits were exhausted. See id., Ex. E at 2.

Response: Disagree. The SOW presented at Ex. E by defendants is unsigned copy without BMS's signature.

24. Plaintiff was identified in the SOW as GfK's "Key Personnel" to perform the contracted services. See id., Ex. E at 2.

Response: Disagree. Plaintiff was hired by BMS, but GfK paid Plaintiff's service which was a way of refunding BMS for the paid but undelivered services. Plaintiff had NO business relationship with GfK. See Yu Statement ¶¶ 8, 22, 38. See Ex. B at 4.

In addition, the SOW presented at Ex. E by defendants is unsigned copy without BMS's signature.

25. BMS agreed to pay GfK an additional fee if it hired the Key Personnel after expiration of the SOW. See id., Ex. E at 2.

Response: Disagree. The SOW presented at Ex. E by defendants is unsigned copy without BMS's signature.

26. The SOW also required that any request for a change to the SOW had to be submitted in writing and did not become effective until the parties agreed to the change and an authorized representative of BMS executed the change order. See id., Ex. E at 2-3.

Response: Disagree. The SOW presented at Ex. E by defendants is unsigned copy without BMS's signature.

## The Contract Between GfK and Scientific Search

27. GfK's contract with Scientific Search indicated that Scientific Search would provide consulting services to GfK "[i]n the form of an on-site consultant –Yue Yu", which were anticipated to be performed "5 days/week (approximately 40 hours per week)" at the rate of $139.00 per hour. See id., Ex. I at 1-2.

Response: Disagree. The Contract is not legal document since it is not signed by Gfk. Scientific Search is a recruiter and doesn't have capability to conduct market research. The Contract is signed for the payment purpose only. See Yu Statement ¶ 10.

28. The term of the agreement was September 21, 2009 through March 31, 2010, "with the potential of extension through the end of 2010" and a proviso that either party could cancel the contract before March 31, 2010 on 30 days' notice. See id., Ex. I at 1.

Response: Disagree. At the time relevant, Plaintiff was not aware of the existing contract. The Contract is not legal document since it is not signed by Gfk.

29. The agreement also provided that it would "be considered for renewal at the end of the contract period, unless cancelled because the quality of the product and/or timeliness of delivery fail to meet GfK Healthcare or client needs." See id., Ex. I at 1.

Response: Disagree. At the time relevant, Plaintiff was not aware of the existing contract. The Contract is not legal document since it is not signed by Gfk.

## The Contract Between GfK and Plaintiff

30. GfK had two contracts with Plaintiff. One related to confidentiality and the other addressed the terms and conditions of the consulting services. See id., Ex. P (Confidentiality Agreement); Ex. J (GfK-Plaintiff Contract).

Response: Disagree. Plaintiff and GfK had a mutual understanding that the Contracts were for payment process purpose only. GfK was only a head hunter serving for BMS' needs of hiring a market researcher. See Yu Statement ¶ 11.

31. The consulting agreement provided that GfK engaged Plaintiff through Scientific Search to provide consulting services and that she would report her hours to GfK on a weekly basis. See id., Ex. J at 1.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only. Plaintiff submitted her monthly timesheet to McGrath for approval. See Ex. F.

32. It also contained a description of services that were anticipated to be performed "5 days/week (approximately 40 hours per week)". See id., Ex. J at 2.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

33. The term of the agreement was September 21, 2009 through March 31, 2010, "with the potential of extension through the end of 2010" and a proviso that either party could cancel the contract before March 31, 2010 on 30 days' notice. See id., Ex. J at 1.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

34. The consulting agreement also provided that it would "be considered for renewal at the end of the contract period, unless cancelled because the quality of the product and/or timeliness of delivery fail to meet GfK Healthcare or client needs." See id., Ex. J at 1.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

### The Contract/Course Between Scientific Research and G&G

35. The contract between Scientific Search and G&G identified Plaintiff as the President of, and main contact with, G&G. See id., Ex. L at 2. It further contained a "Competition" clause pursuant to which G&G agreed that for a period of one year, neither it nor Plaintiff would provide or attempt to provide services to any client to which Scientific Search introduced them. See id., Ex. K at 1.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

36. The agreement also contained representations, among others, that: (1) G&G provided its services to the public, (2) G&G's services were not exclusive to Scientific Search during the

period of the engagement with Scientific Search, and (3) G&G would comply with all applicable laws, including without limitation, the Fair Labor Standards Act. See id., Ex. K at 1-2.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

Plaintiff and G&G didn't offer any service to the public at time relevant; nor G&G' and Plaintiff were engaged in any service to other firms. Plaintiff and G&G had been inactive for several years before the assignment at BMS. See Yu Statement ¶¶ 10-14, 33 – 34.

37. The agreement did not set forth a particular term but indicated that either party could terminate upon thirty (30) days' written notice. See id., Ex. K at 3.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

38. The agreement did not describe in any manner the BMS assignment other than to indicate that G&G would be paid at the rate of $90 per hour and that G&G was required to obtain Scientific Search's approval before working more than forty hours in a given week. See id., Ex. K at 3.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

39. The agreement also required G&G to provide invoices to Scientific Search and stated that payment was not due to G&G until payment was received by Scientific Search. See id., Ex. K at 1, 3.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only. Plaintiff did submit invoice to Scientific Search every month for payment process.

40. The contract also required G&G to maintain general commercial liability insurance at certain levels. See id., Ex. K at 3.

Response: Disagree. The agreement acknowledges Scientific Search is another recruiter and is entitled a fee for finding Plaintiff. The agreement is for payment process purpose only.

41. During the period of the BMS assignment, Plaintiff reported her hours to Scientific Search on a monthly basis, and Scientific Search made payment to G&G directly, promptly after its receipt of an invoice from G&G. See id., Ex. Q (Email from Y. Yu); id., Ex. R (Email from Y. Yu); id., Ex. S (Email from Y. Yu); id., Ex. T (Invoice); id., Ex. C (Yu Dep. 60:6-60:19).

Response: Disagree. During the time relevant, Plaintiff submitted timesheet for McGrath for approval. See Ex. F (Plaintiff's submission of timesheet for approval). However, Plaintiff submitted invoice accompanied by timesheet to Scientific Search for payment process.

## PLAINTIFF'S ASSIGNMENT WITH BMS

42. Ms. McGrath, the Director of Global Oncology Marketing Research ultimately responsible for the research projects on which Plaintiff worked, was Plaintiff's primary contact at BMS. See id., Ex. C (Yu Dep. 69:8-70:19); id., Ex. B (McGrath Dep. 9:14-10:12)

Response: Disagree. McGrath was the hiring manager of Plaintiff. See Ex. B at 4. Later McGrath was the manager of Plaintiff. McGrath provided guidance and instruction of market research projects to Plaintiff, managed Plaintiff's work just as McGrath did to all her team members at BMS. Plaintiff was in constant contact with many employees of multiple functions on regular basis. Plaintiff had many primary contacts at BMS. For example, Lia and Jenny were Plaintiff's primary contact at global procurement; several staff attorneys at Legal Department were her primary contact for reviewing of her SOWs.

Plaintiff also had primary contacts with different marketing team. For example, Dan Guo for lung cancer and EVRI marketing, Susan Heinberg for Ixa marketing, Jill Orosz for XL184 marketing, Marc Weiss for Ipilimumab marketing.

43. Ms. McGrath and Plaintiff scheduled weekly one-on-one meetings, but such meetings did not always occur. See id., Ex. C (Yu Dep. 70:10-70:14); Ex. B (McGrath Dep. 33:10-33:15). Plaintiff also interacted with Ms. McGrath on an ad hoc basis if she had questions. See id., Ex. C (Yu Dep. 70:10-70:14).

Response: Disagree. The weekly meeting was held regularly with few exceptions of business conflicts and personal matters. See Yu Statement. ¶¶ 48-51, 64 and Ex. G at 6-12.

44. Ms. McGrath generally was not aware of the hours Plaintiff worked while providing consulting services to BMS. See Ex. C (McGrath Dep. 32:11-32:15) ("I have no knowledge of what hours [Plaintiff] worked.").

Response: Disagree. McGrath saw Plaintiff several times during a typical working day in that Plaintiff's working station is on McGrath's way to lady's room and cafeteria. Plaintiff was required to report her absence. See Ex. I at BMS02602. See Yu Statement ¶¶ 65-68.

McGrath also routinely review Plaintiff's work products. See Ex. I at BMS00786.

Plaintiff must submit Timesheet to McGrath for approval. See Ex. F.

45. In connection with the projects set forth in the SOW, Plaintiff also:

   a. attended periodic meetings with the marketing research team and the marketing team for her projects, see id., Ex. C (Yu Dep. 70:12-70:19);

   b. received training in BMS's budget management system, see id., Ex. B (McGrath Dep. 27:7-27:12); id., Ex. U (Email from Y. Yu);

   c. received a badge to access BMS's facilities, see id., Ex. C (Yu Dep. 109:6); id., Ex. V (Email from H. McGrath); and

   d. received a BMS email address for her use during the assignment. See id., Ex. C (Yu Dep. 109:6-109:7)

Response: Agree

46.   Plaintiff served as the project lead on various BMS marketing research projects and was given primary responsibility over the development of marketing research plans, selecting an appropriate vendor for such projects, and generating final reports, among other things. See id., Ex. C (Yu Dep. 69:23-70:9, 73:12-75:2).

Response: Disagree. Plaintiff worked under McGrath's guidance and supervision. Plaintiff obtained approvals from McGrath for all market research plans, selection of market research vendors and final reports for primary market research project EVRI and XL184. Plaintiff was requested to provide a copy of all her work furnished for BMS marketing teams. See Ex. G (Yu's notes from meeting with McGrath and emails from McGrath to Yu providing guidance.)

## DISSATISFACTION WITH THE CONSULTING SERVICES

47.   Three significant projects to which Plaintiff was assigned by BMS included: (1) the EVRI Preliminary Positioning Development Project (the "EVRI Project"); (2) the XL 184 Frame of Reference Project (the "XL 184 Project"); and (3) primary and secondary marketing research on the use of particular drugs in breast cancer patients (the "Breast Cancer Project"), each of which will be discussed in turn. See Wiwi Decl., Ex. W (Email from Y. Yu); id., Ex. X (Email from Y. Yu); id., Ex. C (Yu Dep. 71:23-72:14, 100:24-101:5).

Response: Disagree. Plaintiff also performed other tasks, ad hoc analysis, budget management and market research syndicated report evaluation and purchase to support the business needs of BMS. See Yu Statement. ¶¶ 83-87.

## EVRI Preliminary Positioning Development Project

48.   Plaintiff primarily worked with Dr. Dan Guo ("Dr. Guo"), Oncology Global Commercialization Director, in connection with the EVRI Project. See id., Ex. B (McGrath

Dep. 63:2-63:16); id., Ex. C (Yu Dep. 85:12-85:17, 86:10-86:16); Declaration of Danqun Guo ("Guo Decl.")¶¶ 1, 2.

Response: Disagree. The EVRI Preliminary Position Project (EVRI Project) is collaboration among several functions within BMS: Market Research, Marketing, Medical, Research & Development, Clinical Trial and Medical Communications. Dr. Guo served as the marketing lead; whereas, Plaintiff was the lead for market research. See Yu Statement ¶¶ 91-93.

49.    Plaintiff's role in the EVRI Project was to develop marketing research plans and reports. See Wiwi Decl., Ex. C (Yu Dep. 85:25-86:9); Guo Decl. ¶ 2.

Response: Disagree. Plaintiff was the lead of Market Research for the EVRI Project. Plaintiff developed the market research (MR) plan for the EVRI Project. McGrath and Dan Guo had to approve the MR Plan in order to move the Project forward.

Market Research vendor GfK for the EVRI Project was responsible for drafting discussion guide, recruiting research subjects, fielding interviews and interview related logistics, paying honorarium to subjects, drafting topline report and providing a final written report. Plaintiff was responsible for transforming the GfK's report into a presentation, then, presenting to the broader team. See Yu Statement ¶¶ 93- 100.

50.    Plaintiff and some members of the EVRI Project team had disagreements about the EVRI marketing research plans. See Wiwi Decl., Ex. C (Yu Dep. 87:5-87:7, 94:14-94:15); Guo Decl. ¶ 3.

Response: Disagree. There were disagreements, confusions, concerns about the EVRI Project during the stimuli preparation phase of the Project among team members. However, there was never disagreement about the market research plan. See Yu Statement ¶¶ 96-97.

51.    In or about November or December 2009, Dr. Guo reported to Ms. McGrath the EVRI team's concerns that Plaintiff did not fully align with the EVRI team's needs and that he had lost confidence in Plaintiff's ability to deliver on the project to the satisfaction of the EVRI team.

See Wiwi Decl., Ex. B (McGrath Dep. 62:11-63:11); id., Ex. C (Yu Dep. 94:10-94:16, 132:3-132:16); Guo Decl. ¶ 4.

Response: Disagree. On Dec. 11, 2009, McGrath called Plaintiff into her office around 9:30AM. McGrath told Plaintiff that Dan Guo came to see her in the morning and told McGrath that Plaintiff didn't want to take his advice on discussion guide and number of product profiles used as stimuli. See Yu Statement ¶¶ 101- 115.

52.   Plaintiff became aware of Dr. Guo's dissatisfaction with the consulting services by December 2009, at the latest. See Wiwi Decl., Ex. Y (Email from Y. Yu); id., Ex. C (Yu Dep. 86:17-90:4, 132:11-132:16).

Response: Disagree. In November 2009, during the stimuli development phase, Dr. Guo stated that he wanted to test three product profiles. Plaintiff didn't agree in that testing more than one profile with a complex compound is a violation of market research best practices. In light of Plaintiff's explanations, Dan Guo still pushed for his testing idea. See Yu Statement ¶¶ 88 -92, 101-107.

53.   Dr. Guo asked Ms. McGrath for help with the EVRI Project. See Guo Decl. ¶ 6. He also asked if he could bypass Plaintiff and work directly with the vendor for the purpose of effective and efficient communication. See Wiwi Decl., Ex. B (McGrath Dep. 63:7-63:11); Guo Decl. ¶ 6.

Response: Disagree. Plaintiff wasn't in the discussion with Dan and McGrath. However, pharmaceutical industry standard of market research doesn't' support marketing team act as a market researcher and heavily involved in market research processes, nor support marketing team circumvent market research function to directly contact marker research providers. See Yu Statement ¶¶ 104-115.

54.   Ms. McGrath shared this information with Mr. Delghiaccio, who, in turn, discussed Dr. Guo's request with Plaintiff. See Wiwi Decl., Ex. C (Yu Dep. 128:19-129:15). Ms. McGrath asked Plaintiff not to confront Dr. Guo regarding his request. See id., Ex. C (Yu Dep. 129:6-129:15).

Response: Disagree. Plaintiff thinks McGrath may have EVRI Project and Plaintiff seeking feedback with Dan mixed up. Plaintiff is not sure the statement referring which event.

During EVRI Project, Plaintiff and Dan Guo were in constant contact even after Dan Guo asked McGrath to intervene. Both Plaintiff and Dan Guo couldn't have fulfilled their responsibilities for EVRI if they had talked to each other.

For EVRI Project, See Yu Statement ¶¶ 104 - 115.

55. Plaintiff disregarded Ms. McGrath's request and confronted Dr. Guo regarding the feedback he had provided to Ms. McGrath. See id., Ex. C (Yu Dep. 129:21–129:25); Guo Decl. ¶ 7.

Response: Disagree. Plaintiff thinks McGrath may have EVRI Project and Plaintiff seeking feedback with Dan mixed up. Plaintiff is not sure the statement referring which event.

During EVRI Project, Plaintiff and Dan Guo were in constant contact even after Dan Guo asked McGrath to intervene. Both Plaintiff and Dan Guo couldn't have fulfilled their responsibilities for EVRI if they had talked to each other.

For EVRI Project, See Yu Statement ¶¶ 104 - 115.

56. Dr. Guo did not share with Plaintiff, or confirm, the contents of his conversation with Ms. McGrath because he trusted that Plaintiff was aware of the EVRI Project team's dissatisfaction with the EVRI Project progress, as she attended all the key team meetings for the EVRI Project. See Guo Decl. ¶ 8; Wiwi Decl., Ex. C (Yu Dep. 132:11-132:16).

Response: Disagree. Plaintiff believes Dan Guo may have EVRI Project and Plaintiff seeking feedback with Dan mixed up. Plaintiff is not sure the statement referring which event.

During EVRI Project, Plaintiff was aware that Dan's dissatisfaction of Plaintiff's resistance of agreeing on his three product profile testing idea.

There were other issues associated with stimuli development, they were later addressed and resolved. See Yu Statement ¶¶ 101 - 115.

17

57. However, when Plaintiff asked Dr. Guo's opinion as to whether she should apply for a full time job reporting to Ms. McGrath, Dr. Guo encouraged Plaintiff to speak to Ms. McGrath directly and to apply for the position. See Guo Decl. ¶ 9.

Response: Disagree. It is not clear what opinion was referred here. Plaintiff assumes this discussion was irrelevant to EVRI Project which occurred in November and December 2009. Plaintiff had discussion with Dan Guo about the full time position on or about January 25, 2010. If Plaintiff assumes the conversation referred here is about Plaintiff's interest in applying for the position with McGrath's group, one could deduct Dr. had no trouble to work with Plaintiff. Otherwise, why would he encourage Plaintiff to apply for the position with he works with at regularly.

58. Based upon this conversation with Dr. Guo, Plaintiff concluded that Ms. McGrath lied to Plaintiff regarding Dr. Guo's feedback. See Wiwi Decl., Ex. C (Yu Dep. 129:19-129:20, 132:22-132:24).

Response: Disagree. Plaintiff doesn't know what defendants are talking about.

59. Ms. McGrath did not remove Plaintiff from the project as requested by Dr. Guo, but instead provided Plaintiff with feedback on her work product and took a more active role in the project, including reviewing the discussion guide and adjusting the stimulus materials. See id., Ex. B (McGrath Dep. 65:1-66:8); Guo Decl. ¶ 6.

Response: Disagree. Plaintiff assumes Defendants refers the EVRI Project conducted in Dec. 2009. See Yu Statement ¶¶ 104 - 115.

60. Two other BMS employees who were members of Dr. Guo's marketing team and worked on the EVRI project, Eric Sbar ("Mr. Sbar") and Mark Salvati ("Mr. Salvati"), also were very displeased with Plaintiff's work product. See Wiwi Decl., Ex. Z (Emails from E. Sbar & M. Salvati at BMS01679-01681).

Response: Disagree. Eric Sbar and Mark Salvati are not Dan Guo's marketing team members. Rather, Eric Sbar worked on Clinical trials for oncology pipeline products, Mark Salvati worked at BMS medical. Neither of them had training in how to conduct market research projects and how to draft market research questionnaire. That is the reason major pharmaceutical companies such as Pfizer, Johnson& Johnson, Merck, Sanofi-Aventis don't permit non-marketing people to provide comments on questionnaires.

The trainings Mr. Sbar and Mr. Salvati received respectively or lacking of training in market research arena didn't warrant or support their comments on the quality or effectiveness of market research questionnaire. The market research coursed do teach how a questionnaire should be constructed and best effective way to obtain most information from interview, etc.

61. Mr. Sbar and Mr. Salvati complained that Plaintiff did not understand the process by which marketing research proposals were to be transformed into completed reports and ultimately produced unsatisfactory reports. See id., Ex. Z (Emails from E. Sbar & M. Salvati at BMS01679); id., Ex. AA (Email from E. Sbar); id., Ex. BB (Email from M. Salvati).

Response: Disagree. Plaintiff was trained to conduct market research projects and has many years of experience. Eric Sbar worked on Clinical trials for oncology pipeline products, Mark Salvati worked at BMS medical. Neither of them had training in how to conduct market research projects and how to draft market research questionnaire.

Mr. Sbar who is trained oncologist and had been working as an oncologist at a New Jersey local community medical center. Mr. Sbar joined BMS about six months prior to the kickoff of EVRI Preliminary Positioning Project. The EVRI Project was the first market research project Mr. Sbar ever participated. Plaintiff tried very hard to explain the process of market research project to Mr. Sbar without making him feel inferior in the process.

62. In addition, Mr. Sbar and Mr. Salvati were forced to perform additional work, such as drafting marketing research surveys and revising reports, by reason of Plaintiff's inadequate

work product. See id., Ex. Z (Email from E. Sbar at BMS01679); id., Ex. CC (Email from E. Sbar).

Response: Disagree. Nobody forced Mr. Sbar and Mr. Salvati to do drafting marketing research surveys and revising reports. See Defendants' Ex. Z (BMS01681), Clinical and medical stimuli development are the responsibilities for Mr. Sbar and Mr. Salvati in that they were trained in those areas and have expertise.

The email exchanges were in November 2009, the team was experiencing problems with stimuli development which Mr. Sbar and Mr. Salvativ shared responsibilities. Discussion guide development and report drafting were market research vendor Gfk and Plaintiff's responsibilities. See Yu Statement ¶¶ 95 - 115.

63. Ms. McGrath discussed Dr. Guo's concerns regarding Plaintiff's performance and communication issues with Mr. Delghiaccio. See id., Ex. DD (Emails from H. McGrath & R. Delghiaccio at BMS 02518); id., Ex. B (McGrath Dep. 88:20-88:25).

Response: Disagree. Plaintiff has no idea whether the conversations occurred and what were discussed.

The emails exchanges presented by Defendants Ex. DD (Emails from H. McGrath & R. Delghiaccio at BMS 02518) dated January 27, 2010, one and half month after EVRI Project fielding. In the email, McGrath expressed her dissatisfaction with Plaintiff in that Plaintiff provided Topline report to Dan Duo without asking her permission.

McGrath's dissatisfaction is not warranted in that Plaintiff, the assumed independent contractor by BMS, shouldn't take instructions.

See Defendants" "DEFENDANTS HOLLY MCGRATH'S AND BRISTOL-MYERS SQUIBB, COMPANY'S BRIFE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT" page 29 to 32. Defendants argued that BMS exercised minimal supervisory

authority over the day-to-day performance of Plaintiff's work, and accordingly, Plaintiff was independent contractor.

Based upon BMS's theory, only BMS employees follow instructions, not independent contractor. McGrath expected Plaintiff to take and follow her instruction to the letter. McGrath wasn't happy because Plaintiff didn't follow her explicit instructions. This concludes that BMS and McGrath had been considered and treating Plaintiff as an employee.

64.  Ms. McGrath also informed Mr. Delghiaccio that following Dr. Guo's feedback regarding Plaintiff's work on the EVRI Project, Plaintiff had sent reports directly to Dr. Guo without first sending them to Ms. McGrath for her review, despite Ms. McGrath's request to review them in advance. See id., Ex. DD (Emails from H. McGrath & Y. Yu at BMS02518-02519).

Response: Disagree. Plaintiff wasn't aware of the conversation McGrath had with Delghiaccio and what was discussed.  Plaintiff doesn't recall that McGrath provided instruction on obtaining permission before sending report.

The emails exchanges presented by Defendants Ex. DD (Emails from H. McGrath & R. Delghiaccio at BMS 02518) dated January 27, 2010, one and half month after EVRI Project fielding. In the email, McGrath expressed her dissatisfaction with Plaintiff in that Plaintiff provided Topline report to Dan Duo without asking her permission. McGrath's dissatisfaction is not warranted in that Plaintiff, the assumed independent contractor by BMS, shouldn't take instructions.

See Defendants" "DEFENDANTS HOLLY MCGRATH'S AND BRISTOL-MYERS SQUIBB, COMPANY'S BRIFE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT" page 29 to 32.  Defendants argued that BMS exercised minimal supervisory authority over the day-to-day performance of Plaintiff's work, and accordingly, Plaintiff was independent contractor.

Based upon BMS's theory, only BMS employees follow instructions, not independent contractor. McGrath expected Plaintiff to take and follow her instruction to the letter. McGrath wasn't happy because Plaintiff didn't follow her explicit instructions. This concludes that BMS and McGrath had been considered and treating Plaintiff as an employee.

65. When Ms. McGrath contacted Plaintiff regarding her failure to follow Ms. McGrath's explicit instructions, Plaintiff refused to address the issue in her response. See id., Ex. DD (Emails from H. McGrath & Y. Yu at BMS02519).

Response: Disagree. Plaintiff wasn't aware that McGrath wanted to review the Report before sending it to Dan Guo. In addition, Plaintiff can't recall whether she responded to McGrath's email or had conversation with her about her request. See Defendants" "DEFENDANTS HOLLY MCGRATH'S AND BRISTOL-MYERS SQUIBB, COMPANY'S BRIFE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT" page 29 to 32. Defendants argued that BMS exercised minimal supervisory authority over the day-to-day performance of Plaintiff's work, and accordingly, Plaintiff was independent contractor.

Based upon BMS's theory, only BMS employees follow instructions, not independent contractor. McGrath expected Plaintiff to take and follow her instruction to the letter. McGrath wasn't happy because Plaintiff didn't follow her explicit instructions. This concludes that BMS and McGrath had been considered and treating Plaintiff as an employee.

66. Ultimately, Plaintiff worked directly with GfK, and not Ms. McGrath, to complete the final presentation for the EVRI project. See id., Ex. EE (Emails from H. McGrath, R. Delghiaccio, Y. Yu, Y. Okamoto, & J. Baumer at BMS01007-01010).

Response: Disagree. GfK was a market research vendor who conducted EVRI Preliminary Positioning Project on behalf of BMS. Plaintiff, just like every other BMS market researcher, had to work closely with vendors in order to supervise the project, provide guidance and ensure the qualify of the report. It is client (Plaintiff) and vendor (GfK) relationship.

### XL 184 Frame of Reference Project

67.   Plaintiff primarily worked with Jill Orosz ("Ms. Orosz"), Oncology Marketing Director, on

the XL 184 Project. See id., Ex. C (Yu Dep. 72:15-72:23); Ex. FF (Orosz Dep. 13:3-13:13).

Response: Disagree. Plaintiff was the market research lead for XL184 Frame of Reference

Project. Like any other market research projects, XL184 Project was a team effort. The team

comprises marketing, market research, medical and clinical and advertising agency and

market research vendor Gfk. See Yu Statement ¶¶ 117 - 122.

68.   Plaintiff's role in the XL 184 Project was to draft a marketing research plan, select an

appropriate vendor, develop questionnaires for physicians participating in the study, attend

and monitor the research interviews, and draft a report on the findings of such research. See

id., Ex. C (Yu Dep. 73:12-75:19).

Response: Disagree. Plaintiff was the market research lead for the XL184 Project. However,

McGrath provided instruction and guidance from initiating the project to finishing the final

report. See Ex. G, at 5. Other team members also provide suggestions, feedback and requests

to Project lead. In particular, at the beginning of the XL184 Project, Market Research Plan

had to be approved by Adrienne Ross, VP of Oncology Marketing. See Yu Statement ¶¶ 121

- 126.

69.   In or about January 2010, Ms. Orosz informed Ms. McGrath that she found Plaintiff to be

uncooperative and she did not believe Plaintiff to understand the overall objectives of the

project. See id., Ex. FF (Orosz Dep. 24:21-26:6, 33:9-34:10); id., Ex. B (McGrath Dep. 96:24-

97:7).

Response: Disagree. Plaintiff was not aware of the discussion between McGrath and Ms.

Orosz. Neither McGrath nor Orosz informed Plaintiff about the conversation. There are

details about Ms. Orosz's complaint. For example, "uncooperative" what was circumstance when "uncooperative" behavior occurred? Location of the incident? Who was involved? Etc. Ms. Orosz and Ms. Shah demanded Plaintiff to change Market Search Objective to focus more on the link between MoA and value proposition the middle of Pilot testing. Plaintiff tried to explain to Ms. Orosz that the idea of link MoA to product value proposition didn't resonate well with Physicians. It had been tested and it didn't work. See Yu Statement ¶¶ 134 - 138.

70. Ms. Orosz further indicated that Plaintiff was very resistant to feedback regarding Plaintiff's work product and that the marketing research report Plaintiff submitted was of very low quality. See id., Ex. FF (Orosz Dep. 32:3-32:19); id., Ex. B (McGrath Dep. 96:24-97:7, 100:14-100:24).

Response: Disagree. Plaintiff was not aware of the discussion between McGrath and Ms. Orosz. What was the feedback Plaintiff accused of being resistant? When the event happened? Where did it happen? Any witness? Without written document, no details provided, no witness, any accusation is not valid.

During the period of XL184 Project fielding, Orosz didn't provide much feedback expect to demand of changing research objective. See Yu Statement ¶¶ 134 - 138.

Ms. Orosz considered the XL184 Project Report low qualify because the Report stated what she didn't want to hear: there is no link between MoA and value proposition. Ms. Orosz demanded to test the link between MoA and value proposition in light of Plaintiff's objection. The Report reflected what was tested. It is not about quality, rather it is a reality. Ms. Orosz was worried that she might get fired for her poor business judgment. Ms. Orosz asked Plaintiff to tweak the Report to make the Key learning of MoA less direct. Unfortunately, there was very little a market researcher like Plaintiff could do to change the outcome after the fielding was done. See Yu Statement ¶¶ 136 – 139, 143-146.

71. Ms. McGrath discussed Ms. Orosz's concerns with Mr. Delghiaccio. See id., Ex. B (McGrath Dep. 95:10-95:16).

Response: Disagree. Plaintiff was not aware of the discussion between McGrath and Mr. Delghiaccio. In addition, McGrath Dep. 95:10-95:16 referred here has nothing to do with XL184 Project.

72. In or about March 2010, Mr. Delghiaccio worked directly with Plaintiff to complete a draft of the presentation for the XL 184 Project, which was to be subject to Ms. McGrath's later review and approval. See id., Ex. EE (Emails from H. McGrath, Y. Yu, & R. Delghiaccio at BMS01007).

Response: Disagree. As a vendor for XL184 Project, GfK team including Delghiaccio was required to provide a final report to Plaintiff as the XL184 SOW required final product. In addition, GfK team had to provide details and verbatim to help Plaintiff draft Presentation for XL184 Project. In pharmaceutical industry, a Pharma company is considered a client when commissions a primary market research to a market search vendor. Client supervises vendor to execute market research projects.

## The Breast Cancer Project

73. Plaintiff worked with Susan Heinberg ("Ms. Heinberg"), Associate Director of Commercialization, on the Breast Cancer Project as well as other projects. See id., Ex. C (Yu Dep. 100:24-101:5); id., Ex. GG (Email from Y. Yu at BMS01057).

Response: Agree. Susan Heinberg was the marketing lead for the Breast Cancer Project.

74. For the Breast Cancer Project, Plaintiff was tasked with identifying and working with vendors to provide access to databases for primary and secondary marketing research to answer questions related to treatment of hormone-resistant breast cancer. See id., Ex. HH (Heinberg Dep. 18:12-18:22, 19:11-19:21, 62:5-62:10); id., Ex. GG (Email from Y. Yu at BMS01056).

Response: Disagree. There was never discussion about conducting any primary market research to answer questions related to treatment of hormone-resistant breast cancer. Plaintiff worked with BMS Global Procurement Group to negotiate and purchased data sets from IMS Healthcare and Synovate. See Ex. P ((BMS02207-02209(Success Story)).

75.   Plaintiff also was responsible for managing the Breast Cancer Project's budget. See id., Ex. HH (Heinberg Dep. 43:5-45:1, 45:15-46:9).

Response: Disagree. There was no budget allocated for Breast Cancer Project in 2009. The funding used for purchasing the data for the Breast Cancer Project was pooled in from secondary data purchase budget and other market research budget. See Ex. P ((BMS02207-02209(Success Story)).

76.   Though Ms. Heinberg had been pleased with other aspects of Ms. Yu's work, see id., Ex. II (Email from S. Heinberg), in or about March 2010, shortly before the GfK consulting assignment was scheduled to conclude, Ms. Heinberg informed Ms. McGrath that on several occasions Plaintiff had failed to respond to her requests for updates on the status of the project's deliverables from the vendors, IMS and Synovate, and that this failure had delayed the completion of the project. See id., Ex. HH (Heinberg Dep. 61:22-62:4); id., Ex. B (McGrath Dep. 124:24-125:6)

Response: Disagree. After examining Defendants' Ex. HH(Heinberg Dep. 61:22-62:4), Plaintiff found the Deposition of Heinberg doesn't' support the statement here.

In addition, Ms. Heinberg never complained about Plaintiff to McGrath. See Ex. O (Heinberg Dep. 52:7-23). Heinberg stated that she was nervous about the Project deadline since it is approaching the end of March 2010. McGrath made Heinberg aware that Plaintiff's assignment would be ending then.

The phone call McGrath claimed from Susan Heinberg was not a complaint against Plaintiff. Rather it was a nervous call from Heinberg. Heinberg considered Plaintiff the best person to

finish the Breast Cancer Project. Heinberg thinks Plaintiff knows the data sources and is familiar with marketing team's questions. Heinberg worried if she had to switch to someone else, it would take time to get that individual up to speed. See Ex. P at BMS02531. Heinberg was nervous because Plaintiff's assignment would be ended before Breast Cancer Project was complete, which could leave her without support to the Project. Id.

When Heinberg was asked whether she provided a deadline to Plaintiff regarding the Breast Cancer Project, Heinberg admitted that she didn't provide deadline to Plaintiff. Ex. O (Heinberg Dep. 61:6-61:22)

77.   In addition, Ms. Heinberg indicated that Plaintiff requested incorrect information from the vendors, which further delayed the completion of the project. See id., Ex. HH (Heinberg Dep. 41:10-42:15).

Response: Disagree. The above statement is an excerpt from Bristol-Myers Squibb Company Investigation Summary. See Ex. Q. at BMS0003. Susan Heinberg made a statement to Kathleen McElarney, the investigator on May 14, 2010. Ms. Heinberg denied it was her statement, rather it was a summary prepared by Ms. McElarney. See Ex. O, (Heinber Dep. 39:12-39:16)

During Heinberg's Deposition on October 24, 2012, Ms. Heinberg had troubles to provide any details to support her statement on Plaintiff provided incorrect information. Ms. Heinberg couldn't recall the name of the project name nor the vendor she referred to. See Ex. O (Heinberg Dep. 41:10-42:15)

Heinberg is good at providing detailed instruction which enabled Plaintiff to follow the instruction to the letter. See Ex. R at BMS01439. The email is from Heinberg to Plaintiff. In this email Ms. Heinberg provided detailed data requirement for her data analysis. The information was sent to IMS and Synovate when the data purchase negotiation was ongoing. Id.

78.  Ms. Heinberg also reported that Plaintiff had significant difficulty managing the project's budget, resulting in a considerable underuse of the project's resources. See id., Ex. HH (Heinberg Dep. 45:15-46:9).

Response: Disagree. The above statement is an excerpt from Bristol-Myers Squibb Company Investigation Summary. See Ex. Q. at BMS0003. Susan Heinberg made a statement to Kathleen McElarney, the investigator on May 14, 2010. Ms. Heinberg denied it was her statement, rather it was a summary prepared by Ms. McElarney. See Ex. O, (Heinberg Dep. 39:12-39:16)

However, during Heinberg's Deposition on October 24, 2012, Ms. Heinberg had troubles to provide any details to support her statement. Heinberg used many "don't recall" to answer Plaintiff's request of providing details for project name, dollar amount left, etc.

Ms. Heinberg couldn't recall the name of the project name nor the vendor she referred to. But, Have been probing for a while, Ms. Heinberg managed to produce a project name after she answered "do recall" to the same question earlier. See Ex. O (Heinberg Dep. 41:10-42:9).

Plaintiff managed Ixa MR budget update and Giveback in November 2009. Both Jamie Foley and Susan Heinberg were very pleased with Plaintiff's work. See Ex. P at BMS01644-01645 and Ex. P at BMS01405-01407.

79.  At Ms. Heinberg's request, Ms. McGrath intervened and contacted Plaintiff directly to request an update on the status of research deliverables that Ms. Heinberg needed to obtain quickly in preparation for an important presentation. See id., Ex. GG (Emails from H. McGrath & S. Heinberg at BMS01057-01058); id., Ex. B (McGrath Dep. 113:21-114:9); id., Ex. MM (Email from S. Heinberg at BMS02559).

Response: Disagree. Plaintiff didn't now what kind of intervention was done by McGrath in that Plaintiff was fired the next day. Plaintiff is certain McGrath couldn't do much except chasing data from IMS since there was no data provided yet by IMS UK team unless she

falsified it. See Ex. Q at BMS00335 from Bernadette of IMB to Heinberg: "I am unfortunately still waiting for data from our production team to complete slide 5."

Plaintiff kept chasing data from IMS. See Ex. Q at 1, Plaintiff emailed IMS to checking on the data status.

The more important facts were: The data provider IMS had problems to generate data for BMS. Plaintiff or Heinberg, McGrath or anyone else couldn't do much with the data.  Due to the lack of data, the scheduled meetings had to be cancelled and rescheduled several times. IMS had informed Plaintiff several times the delay of data product.

See Ex. R at BMS00311. On March 8, 2010, Plaintiff notified marketing team that IMS team couldn't produce the data as requested. IMS team told Plaintiff "Due to the workload, the UK team has, we will not able to get the data until this Friday. (March12)"

See Ex. R at BMS02453. On March 15, 2010, IMS responded to Plaintiff's inquiry of data production, "they haven't given me a definitive answer; just that they're working on it." Plaintiff notified marketing team that IMS again hadn't had the treatment flow data from its UK team. Plaintiff also warned the team the scheduled meeting to discuss data would be cancelled if IMS US can't produce data.

Ms. Heinberg requested to reschedule the meeting with IMS during the week of March 22, 2010 and meeting with Synovate team during the week of March 29, 2010. See Ex. R at BMS01998.

See Ex. Q at BMS02453, Bernadette of IMS provided a partial finished Deck to Plaintiff. She also informed Plaintiff that her computer kept crashing and she wasn't sure how the individual regimens within each of the groups should be presented. Id. However, Plaintiff doesn't have the response to the email sent by Bernadette at BMS02453, therefore, Plaintiff can't recall what's situation or Plaintiff's response to it. In the email exchanges, Plaintiff asked Bernadette

when she expected the data from UK. Her answer was "They haven't given me a definitive answer; just that they're working on it." Id.

80. Plaintiff responded that she had not yet received the data from IMS and that IMS had informed her that the data would not be available until later that week or the following week. See id., Ex. GG (Email from Y. Yu at BMS01056); id., Ex. B (McGrath Dep. 126:8-126:14).

Response: Agree. IMS had delayed the data delivery several times. The incident described here was one of several delays.

81. When Ms. McGrath then contacted IMS directly, IMS reported that it already had delivered approximately ninety percent (90%) of the material to Plaintiff the previous week. See id., Ex. JJ (Email from H. McGrath); id., Ex. KK (Email from H. McGrath).

Response: Disagree. Plaintiff had no way to find out what was discussed between McGrath and IMS representative. Furthermore, Plaintiff had no idea how the 90% was calculated. The deck referred here at maximum is 50% finished. See Ex. R at BMS00335. The email indicated there were at least six slides contained in the product delivered to Heinberg. Bernadette identified some issues for the slides: "I have questions about slide 4", "I am unfortunately still waiting for data from our production team to complete slide 5. They've assured me that I will have it by the end of the week. I have some data for some of slide 6, some date will come from the production team. I can complete a portion of it today." Id. In addition the Deck sent by from IMS to Plaintiff was different from the one sent out from IMS to Heinberg. See Ex. Q at BMS00335 and BMS02453 for comparison. The deck sent to Plaintiff only contained 4 slides v. 6 slides.

The unspoken working agreement between Susan Heinberg and Plaintiff was to provide finished and polished final product unless specially requested by Heinberg. Ms. Heinberg didn't request Plaintiff to delivery partial products. As a matter of fact, Heinberg

particularly requested Plaintiff to make sure that IMS already has the data laid out as she requested. See Ex. Q at BMS02040.

It was Plaintiff's opinion, the slides were not finished and were not laid out as Susan requested.

82. Ms. Heinberg had not received this data from Plaintiff. See id., Ex. HH (Heinberg Dep. 60:11-61:5).

Response: Disagree. Plaintiff doesn't know what data was referred here. However, Plaintiff was not the data provider. Plaintiff provided patient treatment per marketing team request. However, Plaintiff could not provide analysis if the data were not delivered.

IMS kept informing the delay of data product from its UK office. Synovate team couldn't produce data either. Those data problems are well documented.

The Breast Cancer Project involved two sets of data. One set of data is European Patient data provided by IMS. The other set of data is US patient data. Synovate is the data provider for the US data.

The email chains of email exchanges among McGrath, Synovate and Heinberg indicate Breast Cancer Project was still ongoing as of May 17, 2010. Synovate was still delivering data two months after Plaintiff was terminated. See Ex. Q at BMS00329-00332. Therefore, Plaintiff shouldn't be blamed for the delayed data delivery from Synovate.

83. Ms. McGrath then requested that both vendors send data to Ms. Heinberg directly and work directly with Ms. Heinberg to complete the project. See id., Ex. LL (Email from B. Griffin); id., Ex. JJ (Email from H. McGrath); id., Ex. B (McGrath Dep. 124:24-125:6).

Response: Disagree. Plaintiff was not aware what McGrath did and how Heinberg's reaction to the data. More importantly, the emails were dated on March 23, 2010, one day prior to Plaintiff's termination. The vendors had to work Heinberg directly since Plaintiff was soon after fired.

84.  Ms. McGrath discussed Ms. Heinberg's concerns with Mr. Delghiaccio. See id., Ex. KK
(Email from R. Delghiaccio).

Response: Disagree. Plaintiff was not aware of the discussion.

85.  Mr. Delghiaccio offered to intervene to resolve the situation. See id., Ex. KK (Email from R.
Delghiaccio); id., Ex. MM (Email from R. Delghiaccio at BMS02559).

Response: Disagree. Plaintiff was not aware of the offer.

86.  On at least five occasions during Plaintiff's consulting assignment at BMS, Ms. McGrath
discussed with Mr. Delghiaccio her BMS colleagues' as well as her own dissatisfaction with
Plaintiff's inadequate work product. See Wiwi Decl., Ex. KK (Email from R. Delghiaccio);
id., Ex. DD (Email from H. McGrath at BMS02518); id., Ex. NN(Emails from H. McGrath &
R. Delghiaccio at BMS00128); id., Ex. OO (Email from H. McGrath); id., Ex. PP (Email from
H. McGrath); id., Ex. B (McGrath Dep. 88:7-88:16).

Response: Disagree. McGrath accused Plaintiff's performance as a pretext to terminate
Plaintiff's assignment. There are similar patterns of how McGrath described Plaintiff's
inadequate work product. First of all, timeline, every alleged problem happened *AFTER
January 12, 2010,* when Plaintiff expressed desire of pursuing the full time position with
McGrath's group. **The second pattern is no written evidences/documents** from other
employees to support McGrath's allegations.  All allegations of Plaintiff's poor performance
were convened to McGrath via conversations. The third pattern is lack of follow up. In the
business world, when an employee is accused of poor performance, an improvement plan is
developed and the expected improvement is outlined in the plan. A regular follow up on the
accused employee's performance is required and the manager is required to document the
improvement or lack of. The manager should regularly seek feedback with other employees to
verify the improvement progress of the accused employee.

McGrath alleged Plaintiff's performance was an issue as early as November 2009 and McGrath offered many opportunity to Plaintiff to improve. However, there is no single piece of document to demonstrate any check up of improvement progress. Those follow up of improvements after the first occasion referenced in Defendants' Ex. KK (Email from R. Delghiaccio) is the response from Delghiaccio to please McGrath. Id, the email from McGrath accusing the Plaintiff withholding data has been addressed in previous response. The second occasion referenced in Defendants' Ex. DD (Email from R. Delghiaccio at BMS02518) is not due to Plaintiff's inadequate work. It has been addressed. The third occasion referenced in Defendants' Ex. NN(Emails from H. McGrath & R. Delghiaccio at BMS00128) is what Delghiaccio tried to help McGrath get rid of Plaintiff. The fourth occasion referenced in Defendants' Ex. OO (Email from H. McGrath) is an email authorized by McGrath herself accusing Plaintiff refused to take direction from BMS team members. The statement by McGrath is not corroborated, it also conflicts BMS' claim that Plaintiff was an independent contractor who was not supposed to take directions from BMS.

See Defendants" "DEFENDANTS HOLLY MCGRATH'S AND BRISTOL-MYERS SQUIBB, COMPANY'S BRIFE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT" page 29 to 32. Defendants argued that BMS exercised minimal supervisory authority over the day-to-day performance of Plaintiff's work, and accordingly, Plaintiff was independent contractor.

Based upon BMS's theory, only BMS employees follow instructions, not independent contractor. McGrath expected Plaintiff to take and follow her instruction to the letter. McGrath wasn't happy because Plaintiff didn't follow her explicit instructions. This concludes that BMS and McGrath had been considered and treating Plaintiff as an employee.

The fifth occasion referenced in Defendants' Ex. PP (Email from H. McGrath) is McGrath requested Yoko who was the project lead for GfK responsible for XL184 Frame of Reference Project. Yoko, the vendor's lead should prepare final report, which is what BMS paid GfK to do. In this matter, Plaintiff was the client, GfK was the vendor. McGrath decided to terminate Plaintiff on the same day she wanted Yoko to present the report to the brand team. Yoko would have the best knowledge of XL184 after Plaintiff was terminated. McGrath had to rely on other people to do Plaintiff's work after she terminated Plaintiff.

87. On at least three of these occasions, Mr. Delghiaccio offered to personally intervene to resolve issues concerning Plaintiff's inadequate work performance and other conflicts. See id., Ex. C (Yu Dep. 150:14-151:15); id., Ex. D (Delghiaccio Dep. 68:3-69:24); id., Ex. EE (Email from R. Delghiaccio at BMS01007); id., Ex. KK (Email from R. Delghiaccio); id., Ex. DD (Email from R. Delghiaccio at BMS02518); id., Ex. NN (Emails from R. Delghiaccio at BMS00128-00129).

Response: Disagree. One of the occasions referred by Defendants as Ex. C (Yu Dep. 150:14-141:15) is not what Mr. Delghiaccio offered to personally intervene to resolve concerning Plaintiff's inadequate work performance and other conflicts. In this particular occasion, Delghiaccio volunteered to be the massager for McGrath. Delghiaccio's financial income depends on the amount of business he generated from BMS. Delghiaccio tries very hard to please McGrath in order to obtain more business from BMS and to further his financial income. See Yu Statement ¶¶ 195-198.

On the second occasion referenced as Ex. EE (Email from R. Delghiaccio at BMS01007) is what a market research vendor should do. See Yu Statement ¶¶ 101. BMS commissioned EVRI Project to GfK. Drafting a report is part of the deliverables.

The third occasion referenced in Defendants' Ex. KK (Email from R. Delghiaccio) is the response from Delghiaccio to please McGrath. Id, the email from McGrath accusing the Plaintiff withholding data has been addressed.

The fourth occasion referenced in Defendants' Ex. DD (Email from R. Delghiaccio at BMS02518) is not due to Plaintiff's inadequate work. It has been addressed.

The fifth occasion referenced in Defendants' Ex. NN (Emails from R. Delghiaccio at BMS00128-00129) is what Delghiaccio tried to help McGrath get rid of Plaintiff.

88. Ms. McGrath's personal opinion was that Plaintiff's communication skills were poor, she routinely refused to follow instructions, and she was highly resistant to any feedback on her work. See id., Ex. DD (Email from H. McGrath at BMS02518); id., Ex. B (McGrath Dep. 89:15-90:4). Further, BMS employees, including Ms. McGrath, were required to perform additional work as a result of dissatisfaction with Plaintiff's work product. See id., Ex. Z (Email from E. Sbar at BMS01679); id., Ex. CC (Email from E. Sbar); id., Ex. B (McGrath Dep. 65:19-66:8, 121:16-126:3).

Response: Disagree. Plaintiff had no communication issues at all. The allegation made by McGrath are without written document support. It is pretext to discriminate and retaliate/terminate Plaintiff.

McGrath's dissatisfaction is not warranted in that Plaintiff, the assumed independent contractor by BMS, shouldn't take instructions.

See Defendants" "DEFENDANTS HOLLY MCGRATH'S AND BRISTOL-MYERS SQUIBB, COMPANY'S BRIFE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT" page 29 to 32. Defendants argued that BMS exercised minimal supervisory authority over the day-to-day performance of Plaintiff's work, and accordingly, Plaintiff was independent contractor.

Based upon BMS's theory, only BMS employees follow instructions, not independent contractor. McGrath expected Plaintiff to take and follow her instruction to the letter. McGrath wasn't happy because Plaintiff didn't follow her explicit instructions. This concludes that BMS and McGrath had been considered and treating Plaintiff as an employee.

89.   On several occasions, Ms. McGrath and Mr. Delghiaccio made Plaintiff aware of these complaints and the Company's ongoing concerns regarding her performance. See id., Exhibit QQ (Email from Y. Yu); id., Ex. KK (Email from H. McGrath); id., Ex. B (McGrath Dep. 65:1-65:22); id., Ex. D (Delghiaccio Dep. 69:2-69:24).

Response: Disagree. Plaintiff denies Ms. McGrath and Delghiaccio ever made aware of performance concerns.

90.   Ms. McGrath and Mr. Delghiaccio also provided Plaintiff with constructive feedback on how to improve her performance. See id., Ex. B (McGrath Dep. 65:1-65:25); id., Ex. D (Delghiaccio Dep. 69:2-69:24).

Response: Disagree. Plaintiff denied McGrath and Delghiaccio provided Plaintiff with constructive feedback on how to improved her performance. However, McGrath spoke to Plaintiff about working style and asked Plaintiff to work more closely with her. See Yu Statement. ¶164.

91.   In or about January 2010, Ms. McGrath confirmed with Mr. Delghiaccio that because of Plaintiff's ongoing performance and communication issues, BMS was not interested in extending Plaintiff's engagement beyond March 31, 2010. See id., Ex. C (Yu Dep. 150:14-150:17); id., Ex. QQ (Email from Y. Yu). At that time, Ms. McGrath and Mr. Delghiaccio even considered ending Plaintiff's assignment early as a result of the negative feedback that Ms. McGrath had received regarding Plaintiff's performance. See id., Ex. C (Yu Dep. 128:5-128:12, 150:14-150:17); id., Ex. B (McGrath Dep. 91:23- 92:7).

Response: Disagree. McGrath had no issues with Plaintiff's performance before Plaintiff desired to apply for the full time position within McGrath's group on January 12, 2010. McGrath gave the reason for ending Plaintiff's assignment was the request of Dr. Dan Guo, not the performance of Plaintiff. See the Defendants' Ex. QQ (Email from Y. Yu). The email dated January 24, 2010, from Yu says: "Rob: I have thought more about the BMS assignment situation. Although I don't know what had transpired during last week, it is clear to me that it has something to do with my interest of becoming a full time employee of BMS." Yu continues, "The feedback of my work has been positive from Holly and the teams have recognized my contribution. It perplexes me that Holly is neither forthcoming nor is honest about the reasons of the decision. I don't believe Holly's decision of terminating my assignment is for the best interest of business and is not based upon marketing team's feedback as I learned last week." Id. It is clear from Plaintiff's email, McGrath informed Plaintiff that she wanted to terminate Plaintiff's assignment but didn't cite performance issues. McGrath told Plaintiff Dr. Dan Guo requested to remove Plaintiff from BMS, which is not true.

92.  In summary, from relatively early in the assignment, it was evident that neither Ms. McGrath nor the major stakeholders with whom Plaintiff had been assigned to work were satisfied with Plaintiff's overall work performance. See id., Ex. DD (Email from H. McGrath at BMS02518); id., Ex. OO (Email from H. McGrath); id., Ex. BB (Email from E. Sbar); id., Ex. AA (Email from E. Sbar); id., Ex. HH (Heinberg Dep. 31:4-31:17); id., Ex. FF (Orosz Dep. 32:3-32:19).

Response: Disagree. McGrath had no issues with Plaintiff's performance until Plaintiff decided to apply a full time position on January 12, 2010. After Plaintiff questioned McGrath's motive and fairness in conjunction with Plaintiff's contract termination, McGrath started to use performance issue as a pretext to discriminate and retaliate against Plaintiff.

McGrath can't produce any single document to verify others' complaints of Plaintiff's performance.

## THE MARKETING RESEARCH EMPLOYMENT OPPORTUNITY

93.   In or about January 2010, at a Marketing Research Global Oncology Staff Meeting, Dan Stults, Senior Director of Marketing Research, announced that the department had approved an addition to headcount for a new full-time marketing research position. See Wiwi Decl., Ex. B (McGrath Dep. 103:12-103:16); id., Ex. C (Yu Dep. 121:14-122:3).

Response: Disagree. On January 6, during MR Global Oncology Staff Meeting, Dan Stults, Sr. Director, MR accounted a headcount had been granted to oncology global market research group under McGrath's management. Dan further commented the added headcount would impact the length of Yue's assignment and Holly would keep the communication open. See Ex. XXX(Event Outline_McGrath)

94.   Plaintiff thereafter discussed the employment position with Mr. Delghiaccio, and asked Mr. Delghiaccio to "discuss the solution with Holly [McGrath] on [her] behalf." See id., Ex. QQ (Email from Y. Yu); id., Ex. D (Delghiaccio Dep. 36:6-36:17).

Response: Disagree. Right after learning the new position opportunity, Plaintiff first discussed the head count with McGrath during their weekly one-on-one meeting on January 12, 2010. See Ex,. XXX (Plaintiff's note of 1:1 with Holly.) "Head Count" was the first item on Plaintiff's meeting agenda. Id. See Ex. XXX(Event Outline_McGrath) During the discussion, Plaintiff asked the impact of the headcount to her assignment and expressed her desire of applying for the newly opened position. McGrath welcomed Plaintiff's interest and instructed Plaintiff to discuss the matter with Delghiaccio to make sure there was no provision on Plaintiff's contract to prevent BMS from hiring her. Id.

After the meeting with McGrath, on the same day, Plaintiff called Delghiaccio in the early afternoon on her way to the Newark Airport. Plaintiff told Delghiaccio that she was

interested in pursuing the full time position with BMS and asked Delghiaccio to check the provision of the Contract. Delghiaccio was very supportive and he told Plaintiff that he would discuss the matter with Dan Stults, the manger of McGrath over lunch in next several days. Id.

95. BMS subsequently posted an Associate Director, Global Oncology Marketing Research position. See id., Ex. RR (Job Description); id., Ex. B (McGrath Dep. 82:19-82:24).

Response: Agree.

96. This position required, among other things, a "demonstrated ability to leverage high-value marketing research to enhance and improve decision making, … strong communication skills and the ability to successfully work across functions and geographies." See id., Ex. RR. The candidate also was required to be "adept at developing marketing research plans/budgets which align with the top business priorities." See id., Ex. RR.

Response: Agree. Plaintiff posses the skills required by the position and her work had demonstrated her working ethics, devotion and business expertise.

97. Plaintiff applied for the position. See id., Ex. B (McGrath Dep. 109:25-110:7); id., Ex. C (Yu Dep. 158:3-158:5).

Response: Agree. Plaintiff applied the position both formally and informally. The informall application was in person discussion with McGrath, the hiring manager on January 12, 2010. The Formal application was via BMS's website: www.bms.com on March 1, 2010.

98. On March 1, 2010, Plaintiff contacted Ms. McGrath via email to express her interest the position. See id., Ex. NN (Email from Y. Yu at BMS00129-00130).

Response: Disagree. Ex. NN from Defendants (Email from Y. Yu at BMS00129-00130) not only offered Plaintiff's interest in the full time position with McGrath's group, it also provided Plaintiff's explanation of her qualification and skills. It further offered working closely with McGrath in future project since McGrath wanted Plaintiff to work more closely

with her. The email was sent as a follow up after Plaintiff formally applied the position on BMS's career website. Id.

99. Ms. McGrath relayed this information to Mr. Delghiaccio, who indicated to Ms. McGrath that he would communicate to Plaintiff that given her ongoing performance issues, BMS would not consider her for the position. See id., Ex. NN (Emails R. Delghiaccio & H. McGrath at BMS00128-00129). Ms. McGrath also indicated to Mr. Delghiaccio that she would, and then she did, inform Plaintiff in person that, in light of the negative feedback BMS had received regarding Plaintiff's work product and performance, she would not be considered for the position. See id., Ex. NN (Email from H. McGrath at BMS00129); id., Ex. B (McGrath Dep. 110:8-110:17).

Response: Disagree. McGrath had no issues with Plaintiff prior to Plaintiff's meeting with McGrath on January 12, 2010. McGrath never received complaints about Plaintiff's performance prior to January 12, 2010. See Ex. Delghiaccio Dep. 32:23-35:5. Delghiaccio denied that he had discussion with McGrath regarding Plaintiff's performance in light of the Ex. Del-3 indicates that he wrote to McGrath asking about feedback to Plaintiff. The response to this email was not produced by Defendants.

McGrath had an in person discussion with Plaintiff on March 4, 2010. See Ex. S, at 4 (Meeting note). McGrath told Plaintiff that some candidates she interviewed are more qualified than Plaintiff. When Plaintiff asked McGrath whether being Chinese is a factor of her decision not to consider Plaintiff's application, McGrath didn't deny verbally and her body language confirmed the discrimination is a factor.

100. Ms. McGrath explained to Plaintiff that the interview panel for the position consisted of the same employees who had given negative feedback about Plaintiff's performance, and that she could not recommend Plaintiff for the position. See id., Ex. B (McGrath Dep. 110:14-110:17).

Response: Disagree. McGrath had no any documentation to support her claims of receiving negative feedback about Plaintiff's performance. As a matter of fact, Plaintiff had received numerous compliments for her outstanding work. See Ex. P at BMS02531(Heinberg's feedback). This email is a written feedback provided by Susan Heinberg to Holly McGrath, Jamie Foley, Dan Guo and copy to Linda Kozick responding to McGrath's written request of feedback for Plaintiff. In this email dated February 24, 2010, Ms. Heinberg stated that the feedback is from both she and her manager Jamie Foley. Ms. Heinberg praised Plaintiff "1) We have found Yue to be a very valuable MR partner over the past few months. She is very responsive, proactive, engaged and has added a lot of value as we are working on numerous analysis for Ixepra LCM and Breast TSG. We have also benefited from work she has done for the Lung TSG. 2) We think there would be a lot of value in the continuity of having Yue continue on our ongoing projects, which would mean staying at least through March. She knows the datasources and is familiar with our questions. If we had no support or switched to someone else, it would take time to get that individual up speed. 3) The most critical project we are currently working with Yue on is analysis of multiple date sources acquired at the end of last year so that we can quantify subopportunities within the HR+MBC space. This is a critical deliverable for the DST and will inform other TSG workstreams (Scenario Planning, Asset Prioritization). Many asset teams, including Dasatinib, Brivanib, EVRI and IGF-1R are counting on this work so that they can better identify the most valuable subopportunities within the space and the appropriate fit for their programs. Yue commissioned and is currently working with the vendors to conduct this complex analysis. We believe it will take until at least the end of March to complete. 4) We have also been relying a lot upon Yue as we work on strat plan, various valuations and

preparation for our 1st L MBC DP5 step 1. We would appreciate the chance to continue to do this at least through the end of March, and longer if we do not have the new headcount from your team place. Thanks very much for reaching out to us. Please let Jamie and me know if you need more details about our current projects with Yue or our experience working with her. Kind regards      Susan". Id. This written positive feedback summarized Plaintiff's positive working ethics, devotion, and contribution to the BMS's business.

101. On or about April 1, 2010, BMS hired Neeraj Nadkarni to fill the position. See id., Ex. B (McGrath Dep. 82:19-83:5); id., Ex. SS (Letter from BMS to N. Nadkarni).

Response: Disagree. Neeraj Nadkarni was not a qualified candidate according to the job requirement and McGrath's standards. See Ex. S at 5 (Neeraji Nadkarni's profie on Linkedin). See Defendants' Ex. S at BMs00173 (job posting). Mr. Nadkarni had less than five years of experience, didn't meet the minimum 7 years of experience, Mr. Nadkarni did not work at any pharmaceutical company, did not meeting the industry requirement. Mr. Nadkarni did not have oncology working experience at all. He didn't meet the therapeutic requirement.

In addition, Mr. Nadkarini had communication issues. McGrath summarized in her email communication to Dan Guo, Sanjaya and Jane Stokes, See Ex. S at BMS00701-00702. McGrath commented Mr. Nadkarni doesn't have a lot of oncology experience, so he would have need to get up to speed on the therapeutic area. McGrath further commented there was some concern that his communication style could be more dynamic/engaging. The feedback from Sanjaya Shunglu, Dan Guo are not very totally upbeat either. Mr. Shunglu had mixed impression of Neeraji. "impressive educational credentials but had a hard time living up to them. Discussed leading the positioning practice effort for ZS, but (he) couldn't provide the textbook definition. Seems analytical but not focused." Dan Guo commented that he second Sanjay's finding, he would give Neeraj a low-to-medium score on organizing thoughts.

Plaintiff met every requirement on the job description. The question is why McGrath hired the unqualified candidate instead of Plaintiff?

### PLAINTIFF'S SUBJECTIVE PERCEPTION OF DISCRIMINATION

102. Plaintiff believes that Ms. McGrath did not consider Plaintiff for the Associate Director position because Plaintiff is Chinese. When asked during her deposition why she believes that she was not considered for the position because of her race, Plaintiff responded, "Well, I ask Holly. You know, I ask her, I say, why you don't want to consider me, I know that the performance is not an issue. You use as an excuse just because of, I'm Chinese, and she gave me this body language, like, that I'm convinced, yes, because I was Chinese or I am Chinese." See id., Ex. C (Yu Dep. 138:20-139:3). When asked to describe Ms. McGrath's body language during her deposition, Plaintiff stated "she twisted her shoulder and the head and neck." See id., Ex. C (Yu Dep. 139:24-140:3).1 Ms. Yu refused to demonstrate the purported discriminatory body language. See id., Ex. C (Yu Dep. 139:7-140:7).

Response: Disagree. Plaintiff had a discussion with McGrath on March 4, 2010. McGrath was upset that Plaintiff applied the Position online. McGrath told Plaintiff that she informed the BMS staff manager not to consider her candidacy. McGrath further commented that market team members provided negative feedback about Plaintiff's performance and she can't allow Plaintiff to go through interview process. McGrath further commented that the candidates whom she interviewed were more qualified than Plaintiff.   When Plaintiff asked McGrath the reasons she did not want to consider Plaintiff, McGrath responded, "there are reasons". Then, Plaintiff pressed McGrath "Is that because I am a Chinese?" McGrath didn't deny it. Her body language and facial expression confirmed that being a Chinese was a factor for not being considered for the position Plaintiff applied.

103. In response to Plaintiff's interrogatory requesting information about BMS employees who were "hired" or "fired" by Ms. McGrath or resigned from working for Ms. McGrath during the years 2002 through 2011, by supplemental interrogatory response dated June 13, 2012, Defendants identified the following individuals as having been hired or fired by Ms. McGrath between September 2009 and June 13, 2012:

 a. Neeraj Nadkarni, Asian, Associate Director, Large Tumor Market Research, currently employed by BMS.

 b. Latrice Abanyie, African American, Market Research, currently employed by BMS.

 c. David Chen, Asian, Marketing, voluntarily resigned in March 2011.

 d. Serhii (Serge) Moskalenko, Market Research, currently employed by BMS.

 e. Rashmi Tewari, Asian, Market Research, currently employed by BMS.

 f. Hanson Zheng, on rotation from BMS China, returned to BMS China in June 2012.

 g. Dolores Slayton, Administrative Assistant, African American. Ms. Slayton's employment with BMS was terminated on April 20, 2011. Ms. Slayton's position was eliminated due management decision to consolidate administrative positions.

Response: Disagree. What happed to Hattie Han and Rishabh Mehreja?

## PLAINTIFF'S SUBJECTIVE PERCEPTION OF CONTRACT

104. Plaintiff believes that she entered into an enforceable employment contract with BMS by way of "the chain of contracts" between Plaintiff, G&G, Scientific Search, and GfK:

Q: What's the employment contract to which you're referring?

A: Well, we went over the – the chain of contracts, you know, BMS was with GfK;

GfK was with me, and GfK with Scientific Search; Scientific Search with me, so all

of the above.

[T]he chain from BMS hire GfK, having contract with GfK, GfK have contract with

me and with Scientific Search … [t]hat chain is clear contract. And also, Holly

McGrath had oral agreement with me to extend my contract to December 31, 2010.

See id., Ex. C (Yu Dep. 117:2-117:7; 180:11-180:16). See also id., Ex. C (Yu Dep.

63:2-63:9, 107:4-107:8).

Response: Agree. BMS and Plaintiff had an actual contractual relaship. GfK and

Scientifics' contracts are for payment processing only.

105.    At her deposition, Ms. Yu further testified that during a conversation between

Ms. McGrath and Plaintiff in November or December 2009, "when everyone,

marketing team, market research team were filing their budget for next year . . .

[McGrath] said, yes, we'll have a – you know, because my contract ending March

2010 and then she said there's money allocated by the marketing team and she

would extend my contract at the end of 2010." See Ex. C (Yu Dep. 111:25-112:9).

Later in the same deposition, Plaintiff described the conversation as follows: So I

said Holly, here. You know, there's next year budget and do you consider, you

know, give me the – a contract for next year through the end of 2010. She said, yes,

because, you know, there's money for it and the team was happy with your

performance. And then – so that was discussion. See Ex. C (Yu Dep. 115:13-

115:18).

Response: Disagree. In November 2009, Plaintiff was busy working on the 2010

market research budget for EVRI and Ixempra as the rest of her group did. During

the budget discussion, Plaintiff asked McGrath to extend her contract to the end of

2010. McGrath agreed to do so. McGrath also told Plaintiff that the money for Plaintiff for 2010 had been agreed upon and allocated by EVRI and Ixempra marketing team. See Ex. E at 1-2. (2010 Ixempra Market Research Budget and 2010 EVRI Market Research Plan).

The weekly one-on-one meeting calendar entry also confirmed the agreement of Plaintiff's contract extension. See. Ex. E at BMS00898. McGrath must have told Dolores Slayton, the change of Contract term since Slayton scheduled Plaintiff and McGrath weekly meeting to December 2010.

Delghiaccio wrote an email to McGrath on January 11, 2010. See Ex. S at BMS02315. In this email, Delghiaccio referred Plaintiff as "esteemed consultant, Yue Yu". Delghiaccio also wrote, "you and I should talk about proposed tenure moving forward..... Depending upon how long you would like to keep Yue as part of the team, we will need to discuss requisite logistics for making that happen." Id. This document indicates Plaintiff's contract extension was being discussed, and Delghiaccio was awaiting McGrath's green light to initial a new round of SOW approval process. Id.

## THE TERMINATION OF PLAINTIFF'S PLACEMENT AT BMS

106.   Once Ms. McGrath and Mr. Delghiacco informed Plaintiff that she would not be considered for the Associate Director, Global Oncology Marketing Research position, Ms. McGrath perceived that Plaintiff's performance became progressively less satisfactory. See Wiwi Decl., Ex. KK (Email from R. Delghiaccio); id., Ex. MM (Email from R. Delghiaccio at BMS02559); id., Ex. PP (Email from H. McGrath); id., Ex. UU (Email from H. McGrath); id., Ex. B (McGrath Dep. 120:19-121:11).

Response: Disagree. There were no performance issues or any other issues with Plaintiff's assignment at BMS as late as January 11, 2010. See Ex. S(BMS02315, BMS02502). In the email (BMS02315) from Delghiaccio to McGrath on January 11, 2010, Delghiaccio referred Plaintiff as "esteemed consultant, Yue Yu". Delghiaccio wouldn't consider Plaintiff "esteemed" if Plaintiff had many performance and other issues as McGrath accused. Delghiaccio also wrote, "you and I should talk about proposed tenure moving forward….. since we have 2 consultants on board at BMS, (Yue Yu and Meku Ayele), I would anticipate that based on the current usage rate, these credits will be utilized by the end of Feb. or beginning of March, 2010. Depending upon how long you would like to keep Yue as part of the team, we will need to discuss requisite logistics for making that happen." Id. This indicates that Delghiaccio anticipated McGrath would keep Plaintiff beyond March 2010 and he was gently pushing a new contract for Plaintiff's assignment beyond March 2010 and reminded McGrath to secure funding.

The tone in Delghiaccio's email was positive and respectful towards Plaintiff.

Things changed four days later after that email. See same Ex. at BMS02502. Delghiaccio, on behalf of McGrath, solicited Basya Gale, former consultant for BMS, to work for BMS on NSCLC (lung cancer) research program. Id.

NSCLC market research was managed and conducted by Plaintiff. What changed in four days? Was the reason that McGrath wanted to replace Plaintiff?

It could easily deduce that McGrath must have decided to replace Plaintiff between January 11 and January 15, 2010? Why?

107. As a result of what Ms. McGrath perceived to be Plaintiff's declining performance, and in light of the looming contract end date, Ms. McGrath took on some of Plaintiff's work to ensure that the work was completed on time to the

satisfaction of the stakeholders. See id., Ex. B (McGrath Dep. 121:8-121:15, 122:15-122:19, 124:24-125:6). Among other things, Ms. McGrath participated in conference calls with Mr. Delghiaccio and other GfK representatives to provide guidance to bring the XL 184 presentation that Plaintiff had prepared to the level of quality that the XL 184 team was expecting. See id., Ex. B (McGrath Dep. 122:15-122:19).

Response: Disagree. There were no performance issues or any other issues with Plaintiff's assignment at BMS as late as January 11, 2010. See Ex. S (BMS02315, BMS02502). This event described here was an example McGrath humiliated Plaintiff in front of GfK employees and strip Plaintiff's responsibilities.  GfK's group served as a vendor for XL184 Project. The vendor needs supervision from Plaintiff. However, McGrath asked the vendor to supervise Plaintiff.

108.   On March 24, 2010, the day after Ms. McGrath confronted Plaintiff regarding her failure to provide Ms. Heinberg with the data deliverables from IMS, Plaintiff did not appear at BMS to provide consulting services as expected. See id., Ex. B (McGrath Dep. 120:24-121:11); id., Ex. KK (Email from H. McGrath). Ms. McGrath contacted Mr. Jenkins to apprise him of the situation. See id., Ex. D (Delghiaccio Dep. 50:13-51:11); id., Ex. B

Response: Disagree. Plaintiff doesn't know what is this about.

109.   Given that the assignment was soon coming to an end regardless, Mr. Jenkins and Ms. McGrath decided to end immediately Plaintiff's placement with BMS. See id., Ex. B (McGrath Dep. 120:19-121:5); id., Ex. C (Yu Dep. 158:13-159:12); id., Ex. D (Delghiaccio Dep. 50:20-51:11).

Response: Disagree. The statement is false. Defense counsel told Plaintiff that BMS didn't Scientific Research's existence until Plaintiff was terminated. In addition, this

statement doesn't make business sense. McGrath and Plaintiff agreed that Plaintiff would work until March 31, 2010 to finish the Breast Cancer Project. Dr. Guo, agreed to use Lung Cancer's project budget to cover the payment for Plaintiff for the month of March.

Plaintiff was terminated on the day she was absent from the office. Apparently, McGrath decided to take any dignity away from Plaintiff and further retaliated her.

110.   Mr. Jenkins notified Plaintiff by phone and email that her services were no longer needed by BMS. See id., Ex. C (Yu Dep. 159:8-159:12); id., Ex. G (Email from J. Jenkins at PF00000075).

Response: Agree.

111.   Scientific Search paid to G&G fees for consulting services in full through March 31, 2010, the end of the period set forth in Plaintiff's and Scientific Search's contracts with GfK. See id., Ex. C (Yu Dep. 168:8-168:16, 174:14-174:16); id., Ex. T.

Response: Agree.

**PLAINTIFF'S COMPLAINTS REGARDING HER TREATMENT AT BMS**

112.   On or about March 26, 2010, Plaintiff sent a letter to BMS's President and CEO Lamberto Andreotti ("Mr. Andreotti"), alleging that Ms. McGrath had made false statements about Plaintiff's performance and because of those statements, her contract with GfK had been terminated prematurely and she had been wrongfully denied an opportunity to interview for a full-time position with BMS. See Wiwi Decl., Ex. VV at 1-2.

Response: Disagree. On or about March 4, 2010, Plaintiff challenged McGrath's motive of denying Plaintiff's application of a full time position with BMS. Plaintiff asked McGrath whether being a Chinese was a factor in the consideration of

Plaintiff's candidacy. McGrath didn't deny and her body language confirmed Plaintiff's conclusion. See Ex. S at 4 (Yu meeting note)

Plaintiff originally wanted to complain McGrath to BMS's CEO in early March 2010 after she confirmed the discrimination of her job application. However, Plaintiff did realize that a complaint against McGrath would be negative on McGrath's performance review and the action would make Plaintiff's life even harder at BMS. Thus, Plaintiff decided not file complaint with BMS' CEO's office. Plaintiff learned to let it go and hoped to finish the assignment at BMS with peace and dignity.

Plaintiff planned to finish all projects she was working on. If not possible to finish all ongoing projects, Plaintiff was hoping to transfer the projects to someone with history of the projects, working progress reports and any issues. In addition, Plaintiff planned to say 'farewell" to the colleagues and friends she worked with for several months and wish them well. Plaintiff was also hoping to exchange contact information with colleagues and friends at BMS. However, McGrath deprived all of those hopes and responsibilities from Plaintiff and terminated Plaintiff while she was sick at home.

After the discrimination discussion, McGrath increased hostile attitude and retaliation towards Plaintiff. The ultimate retaliation was to terminate Plaintiff.

On March 24, 2010, after terminated by McGrath 7 days short of the first contract ending, Plaintiff realized that McGrath is a mean spirited person with no respect to

Plaintiff. Plaintiff complained McGrath's behaviors to BMS's CEO hoping BMS would stop her from doing the same things to other minorities.

113.   This letter did not include any allegations of race or national origin discrimination or retaliation. See id., Ex. VV; id., Ex. C (Yu Dep. 160:12-160:24).

Response: Disagree. Plaintiff didn't report the discriminatory behaviors in that Plaintiff was concerned that McGrath could do some counter measurements to defuse Plaintiff's claim. But, the conversation of the discrimination occurred on March 4, 2010 and increased retaliation followed to that discussion.

114.   Plaintiff sent at least four (4) follow up letters to Mr. Andreotti alleging that BMS had terminated her assignment unfairly. See id., Ex. WW; id., Ex. XX; id., Ex. YY; id., Ex. ZZ. None of these other four letters mentioned race or national origin discrimination or retaliation. See id., Ex. C (Yu Dep. 161:13-162:5, 168:1-168:20, 169:2-170:4).

Response: Disagree. Plaintiff didn't report the discriminatory behaviors in that Plaintiff was concerned that McGrath could do some counter measurements to defuse Plaintiff's claim. But, the conversation of the discrimination occurred on March 4, 2010 and increased retaliation followed to that discussion.

115.   Plaintiff also sent an email to Joe Peters, President of Scientific Search, complaining that Ms. McGrath and Mr. Delghiaccio had treated her in a disrespectful manner after she had inquired about the full-time marketing research position. See id., Ex. AAA (Email from Y. Yu). This email also did not contain any allegations of race or national origin discrimination or retaliation. See id., Ex. C (Yu Dep. 172:2-173:20).

Response: Disagree. Scientific Search only acted as a headhunter and recruit placement firm. It did nothing but collecting finder's fee through Plaintiff's work at BMS. Plaintiff didn't contact Scientific Search about the issues with BMS in that Plaintiff was a common law employee at BMS. Plaintiff contacted Scientific Search only to respond its letter threatening legal action against Plaintiff. See Ex. S at BMS02648.

116.   In response to Plaintiff's first letter to Mr. Andreotti, the Company immediately launched an internal investigation into Plaintiff's allegations. See id., Ex. BBB (Investigation Summary).

Response: Agree.

117.   During the course of this investigation, the Company's OCE Investigations Manager, Kathie McElarney ("Ms. McElarney"), spoke with Plaintiff, Ms. McGrath, Dr. Guo, Ms. Orosz, and Ms. Heinberg to discuss Plaintiff's allegations. See id., Ex. BBB at 1-3.

Response: Agree.

118.   In connection with such investigation, on April 12, 2010, Ms. McElarney interviewed Plaintiff. See id., Ex. BBB at 1. Plaintiff did not make any allegations of race or national origin discrimination or retaliation during this interview or at any other point during the investigation. See id., Ex. BBB at 1-2; id., Ex. C (Yu Dep. 141:2-142:24).

Response: Disagree. Plaintiff didn't report the discriminatory behaviors in that Plaintiff was concerned that McGrath could do some counter measurements to defuse Plaintiff's claim. But, the conversation of the discrimination occurred on March 4, 2010 and increased retaliation followed to that discussion.

119.    The investigation did not reveal any misconduct on the part of Ms. McGrath or any other BMS employees. See id., Ex. BBB at 4. As such, the investigation was closed and no further action was taken. See id., Ex. BBB at 4.

Response: Disagree. Ms. McElarney didn't respond to Plaintiff's follow up inquiry after speaking to Plaintiff at the beginning of the Investigation. Ms. McElarney didn't provide any conclusion to Plaintiff.

## THE COMMENCEMENT OF THE PRESENT ACTION

120.    On or about September 7, 2010, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated against because of her race and national origin and was terminated in retaliation for applying for a permanent position with the Company. See Wiwi Decl., Ex. CCC at 1, 4-6.

Response: Agree. EEOC is the right government agency to receive any report of any types of discrimination and retaliation complaints.

121.    Plaintiff had never made any allegations of discrimination or retaliation against BMS or Ms. McGrath prior to her filing of the EEOC Charge in September 2010, which was approximately six months after the termination of her assignment with BMS. See id., Ex. CCC; id., Ex. C (Yu Dep. 141:2-142:24, 160:12-160:24, 161:13-162:5, 166:8-166:24; 168:1-168:20, 169:2-170:4).

Response: Disagree. Plaintiff didn't report the discriminatory behaviors in that Plaintiff was concerned that McGrath could do some counter measurements to defuse Plaintiff's claim. But, the conversation of the discrimination occurred on March 4, 2010 and increased retaliation followed to that discussion.

122.    On or about June 24, 2011, the EEOC issued a right to sue letter indicating that

Plaintiff's allegations did not establish a violation of federal antidiscrimination laws,

and granting Plaintiff the right to file a private cause of action. See id., Ex. DDD at

1-2.

Response: Agree.

123.    On or about September 20, 2011, Plaintiff filed her Complaint commencing the

present action. See id., Ex. EEE. Subsequently on June 25, 2012, Plaintiff filed an

amended Complaint. See id., Ex. FFF.

Response: Agree.

Respectfully Submitted

Yue Yu

By:_____

Yue Yu

*Plaintiff*

Dated: April 15, 2013

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on this 16th day of

April, 2013 upon the following counsel of record via carrier service.


David M. Wissert
**LOWENSTEIN SANDER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 422-6707
dwissert@lowenstein.com


Amy Komoroski Wiwi
**LOWENSTEIN SANDER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2336
Facsimile: (973) 422-6707
awiwi@lowenstein.com

Yue Yu