# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| YUE YU,<br><br>                    *Plaintiff*,<br><br>        v.<br><br>HOLLY MCGRATH and BRISTOL-MYERS SQUIBB, CO.,<br><br>                    *Defendants*. | Civil Action No. 11-5446 (PGS) (DEA)<br><br><br><br>**MEMORANDUM** |

## SHERIDAN, U.S.D.J.

This matter comes before the Court on Defendants Bristol-Myers Squibb, Co. ("BMS") and Holly McGrath's (collectively, "Defendants") Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 (ECF No. 27). *Pro se* Plaintiff Yue Yu ("Yu" or "Plaintiff"), a former marketing research consultant at BMS, alleges that Defendants subjected her to discrimination and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("NJLAD"), and 42 U.S.C. § 1981. Plaintiff further alleges violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and the New Jersey Wage and Hour Laws and Regulations, N.J.S.A. 34:11-56a *et seq*. ("NJWHL"). The Court held oral argument in this matter on March 27, 2014. For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted as to Plaintiff's federal law claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and, therefore, those claims are dismissed with prejudice for lack of jurisdiction.

## I.   BACKGROUND

### A.  Parties

Plaintiff Yue Yu is a resident of Kearny, New Jersey. (Am. Compl. ("Compl.") at ¶ 10). She served as an independent contractor for BMS from September 22, 2009 until the termination of her market research consulting assignment on March 24, 2010. Defendant Bristol-Myers Squibb ("BMS") is a global biopharmaceutical company headquartered in New York, New York which specializes in the discovery, development, and marketing of medical therapies. (Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J. ("Defs.' Statement of Facts") at ¶ 1). It has manufacturing plants and research and development centers located throughout the world, including in Lawrenceville, New Jersey. (*Id.*). Defendant Holly McGrath served as Director of Global Oncology Marketing Research at BMS from November 2000 to December 2012. (*Id.* at ¶ 2).

### B.  Factual Background[1]

In or about July 2009, Defendant Holly McGrath contacted the marketing research vendor GfK Healthcare, LP ("GfK") to request that GfK identify a marketing research consultant to manage certain marketing research projects for BMS's Global Marketing Team in its Lawrenceville, New Jersey office.[2] (*Id.* at ¶ 6). Mr. Robert Delghiaccio served as one of the account managers at GfK who was responsible for all marketing research work performed by GfK on behalf of BMS. (*Id.* at ¶

---

[1] In its Reply Brief, Defendants argue that the Court should exercise its discretion pursuant to L. Civ. R. 7.1(d)(7) and not consider Plaintiff's Opposition to Defendants' Motion for Summary Judgment  because Plaintiff failed to file her Opposition prior to the April 10, 2013 deadline established by the Court. Although Plaintiff filed her Opposition six days past the April 10, 2013 deadline, given Plaintiff's status as a *pro se* litigant and the Court's finding that Defendants were not prejudiced by the late submission, the Court is lenient and will consider Plaintiff's Opposition in determining the instant motion. *See Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993).

[2] According to the Defendants, at all relevant times to this matter, BMS had an ongoing business relationship with GfK pursuant to which "GfK provided various marketing research services for BMS including, without limitation, marketing research facilitation and coordination, and on occasion, providing temporary consultants to manage short-term marketing research projects." (Defs.' Statement of Facts at ¶ 4). Plaintiff describes GfK as a "head hunter and/or recruitment firm in connection with [her] placement at BMS." (Pl.'s Resp. to Defs.' Statement of Facts "Pl.'s Resp.") at 4).

5). Pursuant to Ms. McGrath's request, GfK contacted a technology recruiting and staffing agency by the name of Scientific Search to identify a candidate for the consulting assignment. (*Id*. at ¶ 7). Scientific Search identified Plaintiff and contacted her directly via email in July 2009. (*Id*. at ¶ 9; Pl.'s Statement of Material Facts in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Statement of Facts") at ¶ 1). Mr. P. James Jenkins, Vice President and Practice Lead, was the primary contact at Scientific Search with regard to the BMS assignment. (Defs.' Statement of Facts at ¶ 9). After speaking with Mr. Jenkins and learning more about the position, Plaintiff agreed to submit an application. According to the Plaintiff, Mr. Jenkins informed her that she would need to undergo a "screening process" with GfK before her resume could be submitted to BMS. (Pl.'s Statement of Facts at ¶ 3).

On July 27, 2009, Mr. Delghiaccio held a telephone screening with Plaintiff after which he informed Plaintiff of his intention to present her application to the Global Marketing Team at BMS. (*Id*.). After Mr. Delghiaccio presented Plaintiff's application to BMS, an interview was scheduled. On August 12, 2009, Plaintiff interviewed with several members of the Global Marketing Team, including Defendant McGrath, Mr. Daniel Stults and Mr. Joey Li. (*Id*. at ¶ 6). Approximately one week later, Plaintiff received notice from Mr. Delghiaccio that Ms. McGrath had selected Plaintiff to provide the requested consulting services on behalf of GfK. (*Id*. at ¶ 8; Defs.' Statement of Facts at ¶ 11).

BMS, in accordance with the terms of an existing marketing research agreement with GfK, contracted directly with GfK for Plaintiff's consulting services by executing a Statement of Work ("SOW"). (Defs.' Statement of Facts at ¶ 12). The SOW, which identified GfK as the "Supplier" of services and listed Plaintiff as GfK's "Key Personnel[,]" was effective as of September 11, 2009, and extended only through "the earlier of (a) March 31, 2010 and (b) termination in accordance with the terms of the Agreement[.]" (*See* Decl. of Amy Komoroski Wiwi, Esq. in Supp. of Defs.' Mot. for

Summ. J. ("Wiwi Decl.") at ¶ 7, Ex. E at ¶ 1). The SOW provided a description of the services to be provided by GfK and stated that BMS would "provide office space, telephone, building and hardware and software systems access only as necessary for the proper performance of services." (*Id*. at ¶ 7, Ex. E at ¶ 5). Pursuant to the terms of the SOW, BMS agreed to pay for services actually performed at a rate of $190 per hour and, in the event BMS requested services requiring more than forty hours in a given week, BMS agreed to pay $205 per hour to GfK. (*Id*. at ¶ 7, Ex. E at ¶ 10). BMS also agreed to pay GfK an additional fee if it decided to hire Plaintiff after expiration of the SOW. (*Id*. at ¶ 7, Ex. E at ¶ 11).

In addition to its contract with BMS, GfK also entered into separate contracts with Scientific Search and the Plaintiff individually. GfK's contract with Scientific Search indicated that Scientific Search would provide consulting services to GfK "[i]n the form of an on-site consultant – Yue Yu", which were anticipated to be performed "5 days/week (approximately 40 hours per week)" at the rate of $139 per hour. (*Id*. at ¶ 11, Ex. I at 1-2). The contract described the services to be rendered as follows: "Market Research Consultant to provide full service management and hands-on market research support to Bristol Myers Squibb (BMS) on behalf of GfK Healthcare. Market Research Consultant to report to Holly McGrath, Market Research Director, BMS." (*Id*.). The term of the agreement was September 21, 2009 through March 31, 2010, "with the potential of extension through the end of 2010" and a proviso that either party could cancel the contract before March 31, 2010 on thirty days' notice. (*Id*.). The agreement also provided that it would "be considered for renewal at the end of the contract period, unless cancelled because the quality of the product and/or timeliness of delivery fail to meet GfK Healthcare or client needs." (*Id*.). The contract between GfK and Plaintiff, which was entitled "Consulting Agreement through Scientific American", reiterated

the same terms and conditions as the GfK-Scientific Search agreement and provided that GfK engaged Plaintiff through Scientific Search to provide consulting services. (*Id*. at ¶ 12, Ex. J at 1).

Plaintiff also entered into a separate agreement with Scientific Search around this time. Scientific Search did not contract with the Plaintiff directly, but instead contracted with a company called Great & Guangda Enterprise, Inc. ("G&G") of which Plaintiff was President. (Defs.' Statement of Facts at ¶ 14).[3] The agreement indicated that G&G would be paid at the rate of $90 per hour and that G&G was required to obtain Scientific Search's approval before working more than forty hours in a given week. (Wiwi Decl. at ¶ 13, Ex. K at 3). The agreement also required G&G to provide invoices to Scientific Search and stated that payment was not due to G&G until payment was received by Scientific Search. (*Id*.).

Plaintiff describes the interaction between all of these contracts as follows: "BMS paid $190 per hour to GfK for Plaintiff's work at BMS[.] . . .GfK paid $139 per hour to Scientific Search, . . . [and] Scientific Search paid $90 per hour to [G&G]." (Pl.'s Statement of Facts at ¶ 17). According to the Defendant, during the period of the BMS assignment, Plaintiff "reported her hours to Scientific Search on a monthly basis, and Scientific Search made payment to G&G directly, promptly after its receipt of an invoice from G&G." (Defs.' Statement of Facts at ¶ 41). Plaintiff also submitted her timesheets to Ms. McGrath for approval. (Pl.'s Resp. at ¶ 41).

While Plaintiff was originally scheduled to begin working at BMS on September 21, 2009, her start date was postponed one day until September 22, 2009 due to the fact that Ms. McGrath was out of the office on that day. (Pl.'s Statement of Facts at ¶ 39). Upon her arrival at BMS, pursuant to

---

[3] According to the Defendants, "Plaintiff specifically chose to engage with Scientific Search through G&G – and not in her individual capacity – because Scientific Search offered to pay G&G a higher hourly rate under an arrangement where G&G assumed costs and responsibilities, such as insurance obligations, associated with the engagement." (Defs.' Statement of Facts at ¶ 17). Plaintiff contends that she used G&G to contract with Scientific Search because she was told by Scientific Search that such an arrangement was necessary for GfK and Scientific Search to receive their "finder's fees." (Pl.'s Resp. at ¶ 17).

the terms of the SOW between BMS and GfK, Plaintiff was provided with office space, a telephone line, a computer, access to BMS's software systems, and a security badge giving her access to BMS's facilities in Lawrenceville and Plainsboro. (*Id*. at ¶¶ 40-42). During the term of her assignment, Plaintiff served as the project lead on various BMS marketing research projects and was given primary responsibility over the development of marketing research plans, selecting an appropriate vendor for such projects, and generating final reports. (Defs.' Statement of Facts at ¶ 45). She also attended periodic meetings with BMS's Global Marketing Team and received training in BMS's budget management system. (*Id*. at ¶ 45). Defendant McGrath served as Plaintiff's primary contact and manager at BMS and provided her with guidance and instruction on the market research projects to which she was assigned. (Pl.'s Resp. at ¶ 41). Ms. McGrath and Plaintiff met regularly during weekly one-on-one meetings and also interacted on an ad hoc basis if Plaintiff had questions regarding her assignments. (Defs.' Statement of Facts at ¶ 43).

Three significant projects to which Plaintiff was assigned included: (1) the EVRI Preliminary Positioning Development Project ("EVRI Project"); (2) the XL 184 Frame of Reference Project ("XL 184 Project"); and (3) primary and secondary marketing research on the use of particular drugs in breast cancer patients ("Breast Cancer Project"). (*Id*. at ¶ 47).

Plaintiff worked primarily with Dr. Dan Guo, Oncology Global Commercialization Director, in connection with the EVRI Project. The EVRI Project was a collaboration between several divisions within BMS including Market Research, Marketing, Research and Development, Clinical Trial and Medical Communications. (Pl.'s Resp. at ¶ 49). As lead of market research for the EVRI Project, Plaintiff was responsible for developing marketing research plans and generating reports based on her research. (Defs.' Statement of Facts at ¶ 49). According to the Plaintiff, GfK was "responsible for drafting [a] discussion guide, recruiting research subjects, fielding interviews . . .,

6

paying honorarium[s] to subjects, drafting [a] topline report and providing a written report." (Pl.'s Resp. at ¶ 49). Her responsibilities relating to the EVRI Project entailed "transforming . . . GfK's report into a presentation, then[] presenting to the broader team." (*Id.*).

According to the Defendants, Plaintiff and some members of the EVRI Project had disagreements about the EVRI marketing research plans. (Defs.' Statement of Facts at ¶50). Plaintiff acknowledges that "[t]here were disagreements, confusion[], [and] concerns about the EVRI Project[,]" however, she states that "there was never [a] disagreement about the market research plan." (Pl.'s Resp. at ¶ 50). As a result of these disagreements, Dr. Guo, in November or December 2009, reported to Ms. McGrath that "he had lost confidence in Plaintiff's ability to deliver on the project to the satisfaction of the EVRI team." (Defs.' Statement of Facts at ¶ 51). He also asked if he could bypass Plaintiff and work directly with the vendor for the purpose of effective and efficient communication. (*Id.* at ¶ 53). Ms. McGrath shared this information with Mr. Delghiaccio, who, in turn, discussed Dr. Guo's request with Plaintiff. (*Id.* at ¶ 54). While Ms. McGrath decided not to remove Plaintiff from the project as requested by Dr. Guo, she provided Plaintiff with increased feedback on her work product and took a more active role in the EVRI Project. (*Id.* at ¶ 59).

Defendants present evidence indicating that other participants in the EVRI Project were also displeased with Plaintiff's work related to the Project. For example, Mr. Eric Sbar, who "worked on [c]linical trials for oncology pipeline products," (Pl.'s Resp. at ¶ 60) and Mr. Mark Salvati, who worked in BMS's Medical division, "complained that Plaintiff did not understand  the process by which marketing research proposals were to be transformed into completed reports and . . . [that she] produced unsatisfactory reports." (Defs.' Statement of Facts at ¶ 61). In addition, Mr. Sbar and Mr. Salvati were "forced to perform additional work, such as drafting marketing research surveys and revising reports, by reason of Plaintiff's [allegedly] inadequate work product." (*Id.* at ¶ 62).

According to the Defendants, Plaintiff "[u]ltimately . . . worked directly with GfK, and not Ms. McGrath, to complete the final presentation for the EVRI [P]roject." (*Id*. at ¶ 66).

Plaintiff worked primarily with Jill Orosz, Oncology Marketing Director, in connection with the XL 184 Project. (*Id*. at ¶ 67). As market research lead for the Project, Plaintiff's responsibilities included "draft[ing] a marketing research plan, select[ing] an appropriate vendor, develop[ing] questionnaires for physicians participating in the study, attend[ing] and monitor[ing] the research interviews, and draft[ing] a report on the findings of such research." (*Id*. at ¶ 68). Ms. McGrath provided her with instruction and guidance through the duration of the Project. According to the Defendants, in or about January 2010, Ms. Orosz informed Ms. McGrath that "she found Plaintiff to be uncooperative and she did not believe Plaintiff to understand the overall objectives of the project." (*Id*. at ¶ 69). Ms. Orosz further indicated that Plaintiff was "very resistant to feedback regarding [her] work product and that the marketing research report Plaintiff submitted was of very low quality." (*Id*. at ¶ 70). Plaintiff contends that Ms. Orosz viewed the marketing research report to be of very low quality because it "stated what she didn't want to hear[.]" (Pl.'s Resp. at ¶ 70). After listening to Ms. Orosz's concerns, Ms. McGrath presented them to Mr. Delghiaccio at GfK. (*Id*. at ¶ 71). Mr. Delghiacchio subsequently worked directly with Plaintiff to complete a draft presentation of the XL 184 Project, which was to be subject to Ms. McGrath's later review and approval. (*Id*. at ¶ 72).

Plaintiff worked primarily with Susan Heinberg, Associate Director of Commercialization, in connection with the Breast Cancer Project. (*Id*. at ¶ 73). As market research lead for the Project, Plaintiff worked with BMS's Global Procurement Group to negotiate with and purchase data sets from its vendors, IMS Healthcare and Synovate. (Pl.'s Resp. at ¶ 74). According to the Defendants, "[t]hough Ms. Heinberg had been pleased with other aspects of Plaintiff's work, . . . in or about

March 2010, shortly before the GfK consulting assignment was scheduled to conclude, Ms. Heinberg informed Ms. McGrath that on several occasions Plaintiff had failed to respond to her requests for updates on the status of the project's deliverables from the vendors, IMS and Synovate, and that this failure had delayed the completion of the project." (Defs.' Statement of Facts at ¶ 76). Ms. Heinberg also reported that Plaintiff had "significant difficulty in managing the project's budget, resulting in a considerable underuse of the project's resources." (*Id*. at ¶ 78). Plaintiff contends that her delay in responding to Ms. Heinberg's requests resulted from BMS's vendors having failed to provide her with the necessary information in a timely manner.[4] (Pl.'s Resp. at ¶ 79). When Ms. McGrath contacted one of those vendors directly, however, the vendor reported that it had already delivered approximately 90 percent of the information to Plaintiff the previous week. (Def.'s Statement of Facts at ¶ 81). Ms. McGrath subsequently requested that both vendors send data directly to Ms. Heinberg and work directly with her to complete the Project. (*Id*. at ¶ 83). As she had with the other projects, Ms. McGrath discussed Ms. Heinberg's concerns with Mr. Delghiaccio who offered to intervene to resolve the situation. (*Id*. at ¶¶ 84-85).

Defendants state that "[o]n at least five occasions during Plaintiff's consulting assignment at BMS, Ms. McGrath discussed with Mr. Delghiaccio her BMS colleagues' as well as her own dissatisfaction with Plaintiff's [allegedly] inadequate work product." (*Id*. at ¶ 86). On at least three of these occasions, Mr. Delghiaccio offered to personally intervene to resolve the alleged issues concerning Plaintiff's work performance. (*Id*. at ¶ 87). Ms. McGrath's personal opinion was that "Plaintiff's communication skills were poor, she routinely refused to follow instructions, and she

---

[4] Plaintiff suggests that she did not present the information she had already received based on an "unspoken working agreement between [Ms. Heinberg] and [herself.]" (Pl.'s Resp. at ¶ 81). According to the Plaintiff, the vendor information was "not finished" and "not laid out as [Ms. Heinberg] [had] requested." (*Id*.). Furthermore, Plaintiff indicates that one of the vendors was still delivering data to BMS two months after Plaintiff's termination in March 2010 such that Plaintiff could not have possibly responded to Ms. Heinberg's requests within the time frame indicated. (*Id*. at ¶ 82).

was highly resistant to any feedback on her work."[5] (*Id.* at ¶ 88). As a result of these perceived performance and communication issues, in or about January 2010, Ms. McGrath confirmed with Mr. Delghiaccio that BMS was not interested in extending Plaintiff's engagement beyond March 31, 2010. (*Id.* at ¶ 91). According to the Defendants, at that time, Ms. McGrath and Mr. Delghiaccio also considered ending Plaintiff's assignment early as a result of the allegedly negative feedback that Ms. McGrath had received. (*Id.*).

On or about January 5, 2010, at a Marketing Research Oncology staff meeting attended by the Plaintiff, BMS Senior Director of Marketing Research Dan Stults announced that the department had approved the addition of a new full-time marketing research position. (*Id.* at ¶ 93). On January 12, 2010, during her weekly one-on-one meeting with Ms. McGrath., Plaintiff communicated her interest in the position and "expressed her desire of becoming a permanent employee of BMS[.]" (Compl. at ¶ 26). According to the Plaintiff, "McGrath welcomed [her] interest and instructed [her] to discuss the matter with [Mr.] Delghiaccio[.]" (Pl.'s Resp. at ¶ 94). Ms. McGrath also allegedly told Plaintiff that she would place her into the applicant pool. (Pl.'s Statement of Facts at ¶ 154). Plaintiff thereafter discussed the employment position with Mr. Delghiaccio and asked him to "discuss the solution with Holly [McGrath] on [her] behalf." (Defs.' Statement of Facts at ¶ 94).

Plaintiff alleges that during a conversation on January 20, 2010, Mr. Delghiaccio told her that Ms. McGrath actually "wanted to end her assignment as soon as possible." (Pl.'s Statement of Facts at ¶ 157). According to Plaintiff, Mr. Delghiaccio explained that Dr. Guo had demanded that Ms. McGrath end Plaintiff's assignment and Ms. McGrath intended to act on that demand. (*Id.*). When Plaintiff confronted Dr. Guo the following day, however, Dr. Guo allegedly denied making such a demand. According to the Plaintiff, as a result of Dr. Guo's denial, she "concluded [that] McGrath

---

[5] According to the Plaintiff, "McGrath had no issues with Plaintiff's performance before Plaintiff [ex]ressed her] desire[] to apply for [a] full time position within McGrath's group on January 12, 2010." (*Id.* at ¶ 91).

[had] lied to her about the assignment situation." (*Id.* at ¶ 162). On January 24, 2010, Plaintiff wrote

an email to Mr. Delghiaccio discussing her thoughts on the "BMS assignment situation." (Pl.'s

Statement of Facts at ¶ 163, Ex. S). She wrote:

> I have thought more about the BMS assignment situation. Although I don't know
> what had transpired during last week, it is clear to me that it had something to do
> with my interest [in] become a full time employee of BMS. The feedback of my
> work has been positive from Holly and the teams have recognized my
> contribution. It perplexes me that Holly is neither forthcoming nor is honest about
> the reasons of the decision . . . .It is no doubt that the decision is not fair to me.
> However, I don't want to fight the situation and I don't have to know the reasons.
> All I want is BMS continues my assignment till the market research opening
> position is filled." (*Id.*).

On March 1, 2010, despite allegedly having been informed by Mr. Delghiaccio that Ms.

McGrath wanted to terminate her assignment, Plaintiff contacted Ms. McGrath via email to express

her interest in the Associate Director position. She wrote: "I would like you to consider me for the

full time position in your team. As you have acknowledged that I have demonstrated the skills of a

strong market researcher and I have been doing a great job since I started working at BMS . . . As for

the difference of our working styles, it is easily adjustable and I am working on it." (Wiwi Decl. at ¶

42, Ex. NN, at 3). Shortly after receipt, Ms. McGrath forwarded Plaintiff's email to Mr. Delghiaccio

stating: "I'll follow up with Yue in person; there would be no point in her applying for the position."

(*Id.* at ¶ 42, Ex. NN, at 2). After additional email exchanges, Mr. Delghiaccio responded:

> Well, as usual you and I are in sync. Communications skill is a developmental
> area for Yue. I think part of it is the primary and secondary language situation . . .
> . But I also think part of it is proactively looking to create open communication
> streams . . . . In sum, as you indicate, let's both talk with her about this, indicate
> that the plan is for her to complete her contract (focusing on areas where she is
> strong, like data analysis and interpretation) and then move on. (*Id.* at ¶ 42, Ex.
> NN, at 1).

Several days later, on March 4, 2010, Ms. McGrath informed Plaintiff in person that she

would not be considered for the Associate Director position. (Defs.' Statement of Facts at ¶ 99).

According to the Defendants, Ms. McGrath explained to Plaintiff that the interview panel for the position consisted of the same employees who had given negative feedback about Plaintiff's performance, and that she could not recommend Plaintiff for the position. (*Id.* at ¶ 100). According to the Plaintiff, during this meeting, she asked Ms. McGrath "whether [her] being Chinese [was] a factor [in] her decision not to consider Plaintiff's application[.]" (Pl.'s Resp. at ¶ 99) Plaintiff states that "McGrath didn't deny [the question] verbally and her body language confirmed th[at] discrimination is a factor."[6] (*Id.*).

According to the Defendants, after Ms. McGrath and Mr. Delghiaccio informed Plaintiff that she would not be considered for the Associate Director position, Ms. McGrath "perceived that Plaintiff's performance became progressively less satisfactory." (Def.'s Statement of Facts at ¶ 46). Plaintiff, in turn, contends that after she confronted Ms. McGrath with the allegation of discrimination, McGrath "retaliated [against her] by creating a hostile work[] environment, [taking] responsibilities away [from her] and eventually terminat[ing] Plaintiff's assignment." (Pl.'s Statement of Facts at ¶ 172). For example, Plaintiff contends that after her March 4, 2010 meeting, Ms. McGrath cancelled all of the remaining weekly one-on-one meetings.

On March 24, 2010, one day after Ms. McGrath confronted Plaintiff regarding her alleged failure to provide Ms. Heinberg with the data deliverables from vendor IMS, Plaintiff did not appear at BMS to provide her consulting services as McGrath expected. (Defs.' Statement of Facts at ¶ 108). Ms. McGrath then informed Mr. Jenkins from Scientific Search about the situation. According to the Defendants, "Mr. Jenkins and Ms. McGrath decided to end immediately Plaintiff's placement

---

[6] When asked during her deposition why she believes that she was not considered for the position, Plaintiff responded, "Well, I ask Holly. You know, I ask her, I say, why you don't want to consider me, I know that the performance is not as issue. You use as an excuse just because of, I'm Chinese, and she gave me this body language, like, that I'm convinced, yes, because I was Chinese or I am Chinese. (Deposition of Yue Yu ("Yu Dep.") 138:20-139:3). When asked to describe Ms. McGrath's body language during her deposition, Plaintiff stated "she twisted her shoulder and the head and neck." (Yu Dep. 139:24-140:3).

with BMS." (*Id*. at ¶ 109). On March 25, 2010, Mr. Jenkins notified Plaintiff by email that "[her] assignment at GfK / BMS [was] over – effective immediately." (Wiwi Decl. at ¶ 9, Ex. G). Despite the fact that Plaintiff's consulting services were terminated prior to the March 31, 2010 end date established in the contracts between GfK, Scientific Search and G&G, Scientific Search paid G&G for the additional seven days. (*Id*. at ¶ 111).

On March 26, 2010, Plaintiff sent a letter to BMS's President and Chief Executive Office Lamberto Andreotti alleging that Ms. McGrath had made false statements about her performance and that, as a result of those statements, her contract with GfK had been terminated prematurely and she had been wrongfully denied an opportunity to interview for a full-time position at BMS. (*Id*. at ¶ 112). The letter did not include any allegations or race or national origin discrimination or retaliation. Plaintiff sent at least four additional letters to Mr. Andreotti alleging that BMS had terminated her assignment unfairly; however, none of those letters mentioned race or national origin discrimination or retaliation. According to the Plaintiff, she did not report any allegations of discrimination because she was "concerned that McGrath "could do some counter measure[s] to defuse Plaintiff's claim." (Pl.'s Resp. at ¶ 114). Plaintiff also sent an email to Joe Peters, President of Scientific Search, alleging that Ms. McGrath and Mr. Delghiaccio had treated her in a disrespectful manner after she had inquired about the full-time marketing research position. (Defs.' Statement of Facts at ¶ 115). That email similarly did not include any allegations of race or national origin discrimination or retaliation.

In response to Plaintiff's first letter to Mr. Andreotti, BMS launched an internal investigation into Plaintiff's allegations. (*Id*. at ¶ 116). During the course of this investigation, BMS's OCE Investigations Manager, Kathie McElarney spoke with Plaintiff, Ms. McGrath, Dr. Guo, Ms. Orosz, and Ms. Heinberg to discuss Plaintiff's allegations. (*Id*. at ¶ 117). During her interview with Ms.

13

McElarney on April 12, 2010, Plaintiff did not make any allegations of race or national origin

discrimination or retaliation. According to the Defendants, the internal BMS investigation did not

reveal any misconduct on the part of Ms. McGrath or any other BMS employee. (*Id*. at ¶ 119).

On or about April 1, 2010, BMS hired Neeraj Nadkarni to fill the Associate Director

position. (Defs.' Statement of Facts at ¶ 101). On September 7, 2010, Plaintiff timely filed a Charge

of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC")

alleging that she was discriminated against because of her race and national origin and was

terminated in retaliation for applying for a permanent position with BMS. On June 24, 2011, the

EEOC issued a right to sue letter indicating that Plaintiff's allegations did not clearly establish a

violation of federal antidiscrimination laws and granting Plaintiff the right to file a private cause of

action. (*Id*. at ¶ 122).

On September 20, 2011, Plaintiff filed a Complaint in the United States District Court for the

District of New Jersey. On June 26, 2012, Plaintiff filed an Amended Complaint consisting of nine

counts against Defendants BMS and Holly McGrath. In Count One, Plaintiff alleges race and

national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e *et seq.* Specifically, Plaintiff alleges that Defendants "discriminated against [her]

by treating her differently . . . than similarly situated non-Chinese job applicants and by subjecting

her to discriminatory denials of fair consideration for [a] job application, discriminatory subjection

to disciplinary procedures, [and] disparate terms and conditions of employment[.]" (Compl. at ¶ 47).

In Count Two, Plaintiff alleges that Defendants retaliated against her in violation of Title VII

because "she insisted upon a work environment free of discrimination and because she complained

about discrimination" at BMS. (*Id*. at ¶ 54).  In Count Three, Plaintiff alleges a violation of 42

U.S.C. § 1981. Specifically, Plaintiff alleges that Defendants "denied [her], an Asian American, the

same right to make and enforce contracts as enjoyed by white citizens employed by [BMS]." (*Id*. at ¶ 59). In Count Four, Plaintiff asserts a retaliation claim under 42 U.S.C. § 1981. In Count Five, Plaintiff alleges national origin discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* In Count Six, Plaintiff asserts a retaliation claim under the NJLAD. In Count Seven, Plaintiff alleges that Defendants "misclassif[ied] [her] as an independent contractor" in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* In Count Eight, Plaintiff alleges that Defendants failed to adequately pay her for overtime in violation of the New Jersey Wage and Hour Laws and Regulations, N.J.S.A. 34:11-56a *et seq.* Finally, in Count Nine, Plaintiff asserts a breach of contract claim against BMS. Defendants filed an Answer to Plaintiff's Amended Complaint on July 9, 2012. On March 8, 2013, Defendants filed the instant Motion for Summary Judgment.

## II.       DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id*. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving

party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"

*Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). To do so, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alveras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007). "[P]*ro se* plaintiffs are not relieved of the obligation to set forth facts sufficient to survive summary judgment." *Jacobs v. Cumberland County Dept. of Corrections*, No. 09-0133, 2010 U.S. Dist. LEXIS 130007, 2010 WL 5141717, at *3 (D.N.J. Dec. 8, 2010).

16

**B.  Plaintiff's Discrimination Claims Under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 – Counts One and Three**

In Counts One and Three of the Amended Complaint, Plaintiff alleges that BMS and Ms. McGrath discriminated against her by refusing to consider her candidacy for a full-time marketing research position because she is Chinese. In support of her claim, Plaintiff relies upon (1) her subjective belief that Ms. McGrath's body language and facial expressions during a conversation on March 4, 2010 suggested discriminatory intent, and (2) the fact that several individuals of various ethnic and racial backgrounds who previously worked for Ms. McGrath were either fired or resigned from BMS. Defendants contend that neither provides a sufficient basis to withstand summary judgment.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). In the absence of direct evidence, a plaintiff may prove discrimination under Title VII through the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[7] Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination. *Id.* at 802. In order to establish a *prima face* case of race or national origin discrimination under Title VII, a plaintiff must show that (1) she belongs to a protected class; (2) she was otherwise qualified for the position to which she applied; (3) she was subject to adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out

---

[7] "[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999)).

individuals with qualifications similar to the plaintiff's to fill the position. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

Once the plaintiff establishes a *prima facie* case for discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's articulated reason was in fact pretext for discrimination. *Id.; see also Terry v. Town of Morristown*, 446 Fed. Appx. 457, 461 (3d Cir. 2011). To prove pretext and defeat summary judgment, the plaintiff must "submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)). A plaintiff "may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 867 A.2d 1133, 1138 (N.J. 2005). In this instance, Plaintiff has not presented, nor does she allege, that there is any direct evidence of race or national origin discrimination. Accordingly, her claims are analyzed pursuant to the *McDonnell Douglas* framework. For purposes of this motion, Defendants "assume that Plaintiff can establish the elements [of] a *prima facie* case[]" of discrimination. (Defs.' Br. in Supp. of Mot. for Summ J. ("Defs.' Br.") at 5 n.2). The Court's discussion is, therefore, limited to whether Plaintiff has presented sufficient evidence to show that Defendants' articulated reason for her termination – poor performance - was both pretextual and motivated by discriminatory intent.

Here, the Defendants present legitimate evidence showing that they did not consider Plaintiff for the full-time marketing research position because of her unsatisfactory performance of consulting services during the five-month period preceding her application. For example, in late 2009, in connection with the EVRI project, Dr. Guo reported to Ms. McGrath the EVRI team's concerns that Plaintiff did not fully align with the EVRI team's needs and that he had lost confidence in Plaintiff's ability to complete the project to the satisfaction of the EVRI team. Two other members of the EVRI Project team, Mr. Sbar and Mr. Salvati, also expressed their dissatisfaction with the quality of Plaintiff's work product. In early 2010, Ms. Jill Orosz reported to Ms. McGrath that, in connection with the XL-184 Project, she found Plaintiff to be uncooperative and that Plaintiff did not understand the overall objectives of the project. Ms. Orosz further indicated that Plaintiff was very resistant to feedback regarding her work and that the marketing research report submitted by the Plaintiff was of very low quality. In March 2010, Ms. Susan Heinberg informed Ms. McGrath that Plaintiff's performance with regard to the Breast Cancer Project was unsatisfactory. Defendants contend that "[t]hese ongoing performance and communication issues were the reason Plaintiff was not considered for the full-time marketing research position, which explicitly required 'strong communication skills' and the ability to 'develop[] marketing research plans/budgets which align with the top business priorities.'" (Defs.' Br. at 10). The Third Circuit has held that a long history of poor performance is a legitimate, non-discriminatory reason for implementing adverse employment action. *See D'Alessandro v. City of Newark*, 454 Fed. Appx. 53, 56 (3d Cir. 2011); *see also Casseus v. Elizabeth Gen. Med. Ctr.*, 287 N.J. Super. 396, 671 A.2d 176, 181 (N.J. App. 1996) (stating that "an employee's poor performance in discharging his duties is a legitimate[,] nondiscriminatory reason to fire or demote the employee."). As such, Defendants have satisfied their burden at the second stage of the *McDonnell Douglas* analysis.

To meet her burden at the third stage of the analysis, Plaintiff must show that Defendants' proffered legitimate, non-discriminatory reason — poor performance — is pretext for discrimination. Thus, Plaintiff has to present evidence that would allow a factfinder to reasonably conclude that the reason offered by BMS was fabricated, or to otherwise find that BMS did not consider her for the full-time marketing position for discriminatory reasons. *See Fuentes*, 32 F.2d at 762. As stated by the Third Circuit, "[t]o cast doubt on a company's proffered reasons for an adverse employment action, it is not enough to show that the company's decision was 'wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Emmett v. Kwik Lok Corp.*, 2013 U.S. App. LEXIS 12009, at * 9-10 (3d Cir. 2013) (citing *Fuentes*, 32 F.2d at 765). Instead, Plaintiff is required to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [BMS's] proffered legitimate reason[] for its action that a reasonable factfinder *could* rationally find [it] unworthy of credence . . . and hence infer that [BMS] did not act for the asserted non-discriminatory reason[]." *Fuentes*, 32 F.2d at 765 (internal citations omitted).

Here, the Court finds that Plaintiff has failed to present sufficient evidence from which a reasonable jury could rationally find that BMS's articulated reason for its employment action was false, or that the decision to not consider her for the full-time marketing position was the result of discriminatory motive. In her Amended Complaint, Plaintiff makes two allegations to support her claim that BMS did not consider her for employment because she is Chinese. First, Plaintiff alleges that Ms. McGrath's "body language and facial expressions" during a March 4, 2010 meeting indicated to her that her Chinese ancestry played a role in Ms. McGrath's decision. Second, Plaintiff alleges that several employees of various races and ethnicities resigned or were terminated from Ms. McGrath's group at BMS since 2008.

The Court finds that neither of these allegations is sufficient to demonstrate pretext or discriminatory motive for several reasons. First, Plaintiff's subjective interpretation of McGrath's body language and facial expressions is insufficient as a matter of law to create a genuine issue of material fact to be decided by a jury. *See Jones v. Sch. Dist. of Phila.*, 19 F. Supp. 2d 414, 420 (E.D. Pa. 1998) (stating that "[i]t is . . . well established that the plaintiff's own belief or feeling that he was the victim of disparate treatment is insufficient, standing alone, to preclude judgment as a matter of law."). Second, Plaintiff fails to present sufficient evidence indicating that BMS or Ms. McGrath had a pattern or practice of discrimination. *See Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977) (stating that a plaintiff must "establish by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure – the regular rather than the usual practice."). It is notable that Neeraj Nadkarni, a minority candidate of Asian ethnicity, ultimately was hired by Ms. McGrath to fill the position for which Plaintiff applied. Moreover, Ms. McGrath, the individual who allegedly discriminated against Plaintiff, is the very same person who approved Plaintiff's assignment to provide consulting services to BMS through GfK. "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). For these reasons, after viewing the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has failed to introduce sufficient evidence from which a reasonable jury could conclude that Plaintiff's Chinese ancestry was a factor in Defendants' decision to deny her candidacy for the full-time marketing research position. Accordingly, the entry of summary judgment on Counts One and Three of Plaintiff's Amended Complaint is appropriate.

**C.  Plaintiff's Retaliation Claims Under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 – Counts Two and Four**

In Counts Two and Four of the Amended Complaint, Plaintiff alleges that Defendants retaliated against her for (1) applying for the full-time marketing research position and (2) filing a charge of discrimination with the EEOC. Defendants argue that the entry of summary judgment on these counts is appropriate for two reasons. First, Defendants contend that the act of applying for a job does not constitute "protected activity" within the meaning of the statutes. Second, Defendants argue that because Plaintiff filed a charge of discrimination with the EEOC almost six months after she had already been terminated, no causal link exists between that protected activity and the adverse employment action.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to retaliate against an applicant for employment "because he has opposed any practice made an unlawful employment practice by this title . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title[.]" 42 U.S.C. § 2000e-3(a).  The Third Circuit applies the *McDonnell Douglas* framework to retaliation claims under Title VII where the evidence of discrimination is circumstantial.[8] *See McKenna v. City of Phila.*, 649 F.3d 171, 178 n.7 (3d Cir. 2011). To establish a *prima facie* case of unlawful retaliation under Title VII, a plaintiff must show that "(1) she engaged in activity protected by Title VII, (2) her employer took adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action." *Jackson v. Temple Univ. Hosp., Inc.*, 501 Fed. Appx. 120, 123 (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

---

[8] The same standard that is used in the context of Title VII retaliation claims also applies to retaliation claims brought under 42 U.S.C. § 1981. *See Jackson v. Temple Univ. Hosp., Inc.*, 501 Fed. Appx. 120, 123 n.2 (3d Cir. 2012) (stating that "claims under 42 U.S.C. § 1981 are governed by standards identical to those applicable to . . . Title VII claims.") (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)).

Plaintiff first alleges that Defendants retaliated against her because she applied for the full-time marketing research position. To engage in protected activity within the meaning of Title VII, an applicant or employee must explicitly convey to the employer her belief or concern that the employer has engaged in a discriminatory practice made unlawful by Title VII. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "Since inquiring about a job application is not a protected activity," the Court finds that Plaintiff has failed to establish a *prima facie* case of retaliation under Title VII. *Siddiqi v. New York City Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008). Accordingly, to the extent that Plaintiff's retaliation claim is based on Defendants having retaliated against her for applying for the full-time marketing research position, the entry of summary judgment is appropriate.

Plaintiff also alleges that her consulting assignment was terminated in retaliation for her having filed a charge of discrimination with the EEOC. It is undisputed, however, that Plaintiff filed her complaint with the EEOC on September 7, 2010, almost six months after the decision to prematurely terminate her assignment with BMS was made. Plaintiff, therefore, cannot establish a causal connection between the termination of her assignment and the filing of her EEOC complaint. Accordingly, she fails to establish a *prima facie* case of retaliation and, therefore, to the extent that Plaintiff's retaliation claim is based on her having filed a charge of discrimination with the EEOC, the entry of summary judgment is appropriate

## D.  Plaintiff's Claim Under the Fair Labor Standards Act - Count Seven

In Count Seven of the Amended Complaint, Plaintiff alleges that Defendants failed to pay her the appropriate overtime wage for all hours worked in excess of 40 hours per week in violation of 29 U.S.C. § 207. Defendants argue that summary judgment should be granted on Count Seven because Plaintiff was an independent contractor who was not covered by the FLSA.

29 U.S.C. § 207 provides, in relevant part, that "no employer shall employ any of his employees. . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The overtime provision of the FLSA applies only to employees, not to independent contractors. *See id*. (indicating application to "employees" of "employers"); *see also Hicks v. Mullahan*, 2008 U.S. Dist. LEXIS 36362, at *13 (D.N.J. May 5, 2008) (stating that "as an independent contractor, Plaintiff is not protected under the Fair Labor Standards Act . . . , which applies only to *employees* of covered employers.").

In determining whether an individual is an employee within the meaning of the FLSA, Courts consider: "(1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending on his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of performance of the working relationship; [and] (6) whether the service rendered is an integral part of the alleged employer's business." *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1386 (3d Cir. 1985). Here, after considering these factors and viewing the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could conclude that Plaintiff was an employee of BMS. Rather, as explicitly indicated in the contract between Plaintiff and GfK, Plaintiff served as an independent contractor of BMS. Accordingly, Plaintiff is not entitled to the protections of the FLSA and the Court will enter summary judgment in favor of the Defendant's on Count Seven of the Amended Complaint.

**E.  Plaintiff's State Law Claims – Counts Five, Six, Eight and Nine**

The Court, having granted summary judgment on Counts One, Two, Three, Four, and Seven, will decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Counts Five, Six, Eight and Nine which assert strictly state law claims against the Defendants. A district court, pursuant to 28 U.S.C. 1367(c)(3), "may decline to exercise supplemental jurisdiction over a claim . . . if . . .(3) the district court has dismissed all claims over which it had original jurisdiction[.]" *Edlin Ltd. v. City of Jersey City*, 2008 U.S. Dist. LEXIS 41118, at *24 (D.N.J. May 23, 2008) (citing *Atkinson v. Olde Economie Fin. Consultants, Ltd.*, 2006 U.S. Dist. LEXIS 54289, at *5 (W.D. Pa. Aug. 4, 2006)). This determination is discretionary and "[t]he general approach is for a district court to . . . hold that supplemental jurisdiction should not be exercised when there is no longer any basis for original jurisdiction." *Id*.; *see also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997) (stating that "pendent jurisdiction 'is a doctrine of discretion, not of plaintiffs right,' and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons") (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)). As the Court will enter summary judgment in favor of the Defendants on Counts One, Two, Three, Four and Seven – the only claims over which this Court has original jurisdiction - it shall decline to exercise supplemental jurisdiction over Plaintiff's state law claims in Counts Five, Six, Eight and Nine. Accordingly, the Court will dismiss those claims with prejudice for lack of jurisdiction.

III.    **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted with respect to Counts One, Two, Three, Four and Seven. The Court will dismiss Counts Five, Six, Eight and Nine with prejudice for lack of jurisdiction. An appropriate Order follows.


Date: March 27, 2014                              *s/Peter G. Sheridan*
                                                   PETER G. SHERIDAN, U.S.D.J.